<pre>
 1              IN THE UNITED STATES DISTRICT COURT

 2             IN AND FOR THE DISTRICT OF DELAWARE

 3
        KYMA CAPITAL LIMITED, et al.,   )
 4                                      )
        --------------------Plaintiffs,)
 5                                      )Case No.
               vs.                      )23-CV-670-RGA-
 6                                      )LDH
                                        )
 7      PJT PARTNERS INC., et al.,      )
                                        )
 8      --------------------Defendants.)

 9                 TRANSCRIPT OF MOTION HEARING

10

11           MOTION HEARING had before the Honorable

12      Laura D. Hatcher, U.S.M.J., via teleconference

13      on the 20th of September, 2023.

14

15                        APPEARANCES

16           HEYMAN ENERIO GATTUSO & HIRZEL, LLP
                  BY:  JAMIE BROWN, ESQ.
17
                          -and-
18
             PALLAS PARTNERS LLP
19                BY:  SHIREEN BARDAY, ESQ.
                       BRIANNA SIMOPOULOS, ESQ.
20                     FIONA HUNTRISS, ESQ.
                       ALYSHA PATEL, ESQ.
21
                               Counsel for Plaintiff
22

23

24

25
</pre>

```
1          (Appearances continued.)

2


3          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
               BY:  ANDREW REMMING, ESQ.
4                   JONATHAN WEYAND, ESQ.

5                        -and-

6          WILLKIE FARR & GALLAGHER LLP
               BY:  STUART LOMBARDI, ESQ.
7                   COLIN LEE, ESQ.
                    LAWRENCE SLUSKY, ESQ.
8                   ALEENA NASIR, ESQ.

9                              Counsel for Defendants

10         ASHBY & GEDDES
               BY:  CATHERINE GAUL, ESQ.
11
                            -and-
12
           WHITE & CASE LLP
13             BY:  JACQUELINE CHUNG, ESQ.
                    HANNELORE SKLAR, ESQ.
14
                              Counsel for Intervenor
15

16

17

18

19

20

21

22

23

24

25
```

1            THE COURT:  Let's get started.  Okay.

2     Who is on the line on behalf of Petitioner,

3     please, starting with our Delaware lawyers

4     first?

5            MS. BROWN:  Good afternoon, Your

6     Honor.  This is Jamie Brown of Heyman, Enerio,

7     Gattuso, and Hirzel, LLP, on behalf of

8     Petitioners.  I am joined on the line by my

9     colleague from Pallas Partners LLP including

10    Shireen Barday, Brianna Simopoulos, as well as

11    two other colleagues from their London office,

12    Fiona Huntriss and Alysha Patel.  With Your

13    Honor's permission, Ms. Barday, who has been

14    admitted pro hac vice will be arguing on behalf

15    of Petitioners today.

16            THE COURT:  Fantastic.  Absolutely.

17    Good afternoon, and welcome to you all.

18        Who is on the line on behalf of

19    Respondents starting with Delaware lawyers

20    first, please?

21            MR. REMMING:  Good afternoon, Your

22    Honor.  It's Andrew Remming from Morris Nichols

23    representing PJT Partners and Anchorage Capital

24    Group, LLC.  I'm joined in my office by my

25    colleague Jonathan Weyand and then my friends

1    and colleagues from the Willkie, Farr, and

2    Gallagher firm are also on the line.  They are

3    Stuart Lombardi, Colin Lee, Lawrence Slusky,

4    key and Aleena Nasir.  Mr. Lombardi, who has

5    been admitted pro hac vice, will handle the

6    presentation for PJT and Anchorage today.

7            THE COURT:  Fantastic.  Welcome and

8    thank you.

9        And for the intervenor?

10           MS. GAUL:  Good afternoon, Your

11   Honor.  This is Catherine Gaul from Ashby and

12   Geddes on behalf of Orpea.  I'm joined this

13   afternoon by my colleagues at White and Case

14   Jacqueline Chung and Hannelore Sklar.

15   Ms. Chung will be presenting on behalf of Orpea

16   this afternoon.

17           THE COURT:  Fantastic.  Good

18   afternoon.

19       So we have a full house here, so without

20   further ado, how about we go ahead and jump

21   right in.

22       Petitioner, this is your application, so

23   let me hear from you first, please, and that's

24   Ms. Barday; correct?

25           MS. BARDAY:  Yes, thank you, Your

1       Honor.  We have three points just briefly.

2              So the first is just to set the stage on

3       the procedural posture here.  We're here

4       seeking leave to serve a subpoena.  Today we

5       are not here to cover issues of scope.  The law

6       is well settled in this area.  The issues of

7       scope are better resolved after a

8       meet-and-confer process.  There has be no

9       process like that here.  We are just here

10      determining whether or not petitioners are able

11      to serve a subpoena on companies found in

12      Delaware who are not parties to a foreign

13      proceeding but who have documents that may be

14      admissible and may be of interest to the

15      foreign proceeding.

16             Now, yesterday, Intervenor submitted --

17      and this is our second point -- a document

18      called Supplemental Authority that included two

19      decisions coming out of the courts in France,

20      and we waned to clarify that that submission is

21      incomplete, that it did not include

22      Petitioner's notice of appeal filed from the

23      proceeding that was submitted to this Court on

24      September 18th.  The petitioners filed an

25      appeal from that proceeding, so while the

1    letter suggests that all the proceedings in

2    France have been wound up, they are ongoing,

3    including a direct appeal from one of the cases

4    submitted yesterday.  So there is a proceeding

5    ongoing in which evidence from the 1782 may be

6    used, and we've cited -- I believe it was on

7    page 15 of our opening brief -- a number of

8    cases showing that the French courts are

9    receptive to 1782 discovery.

10           Now, our last point is with respect to

11   this conciliation confidentiality.  The papers

12   submitted -- much ink has been spilled

13   suggesting that we are seeking only privileged

14   materials, and that is incorrect.  So in the

15   first instance, the issue of conciliation

16   confidentiality, as Your Honor has probably

17   gathered from the numerous declarations

18   submitted on this point, is the kind of foreign

19   law issue that Courts are often cautioned not

20   to weigh into on the United States' side.  But

21   more importantly, our subpoena has a provision

22   that addresses any documents that may need to

23   be withheld based on Instruction 5, the claim

24   of privilege, or otherwise.  And there's a

25   provision for parties to log those documents in

1    a privilege log, much like you would

2    attorney-client privileged documents.

3         We don't think that conciliation

4    confidentiality covers all of the documents at

5    issue, and unquestionably, the date range for

6    our subpoena includes documents that would have

7    been produced before any conciliation was even

8    conceived of and certainly cover a period

9    afterwards, including a number of proceedings

10   that are public and questionably outside the

11   conciliation privilege.  Those include the

12   lock-up proceedings and the accelerated

13   safeguard proceedings.  So the fact (audio

14   failure) some documents that may be subject to

15   conciliation confidentiality is not a basis at

16   this point to deny the petitioner's leave to

17   serve the subpoena in the first instance is an

18   issue (audio failure).

19            THE COURT:  Ms. Barday, I keep losing

20   you.  I think you've just cut out.  The last

21   words I heard were "this is not a basis to deny

22   and that's an issue for" and then I lost you.

23            MS. BARDAY:  I understand.  I'm sorry

24   about that.

25            This is -- so the issue of whether or not

1    some of the documents requested -- some of the

2    requests in the subpoena might arguably cover

3    documents that are subject to conciliation

4    confidentiality is an issue best resolved

5    through a meet-and-confer process.  Or as we've

6    set forth in our brief, those documents could

7    be with held and logged; right?  So that there

8    is no issue about the compelled production of

9    documents that are otherwise subject to

10   conciliation confidentiality.

11        And the only other two points on that

12   issue, Orpea has intervened to say we're

13   seeking only their documents.  In fact, we are

14   not seeking any documents from Orpea.  No one

15   has sought any documents from Orpea in the

16   French proceedings.  We're seeking only

17   documents from PJT and Anchorage, who are not

18   parties to the French proceedings.

19        And as to the point raised now that, in

20   particular in the submission of yesterday, that

21   certain discovery was denied to the Bank of

22   India, I just wanted to focus the Court's

23   attention on the French Court's holding, which

24   was not that those documents can never be

25   produced.  The French Court's holding was what

1    you have presented to me so far shows me that

2    the public disclosures don't allow me to

3    conclude there's been a waiver of

4    confidentiality, but what the French court

5    holding indicates is that, in fact, if a party

6    has voluntarily disclosed to other third

7    parties confidentiality information that

8    otherwise would be covered by conciliation

9    confidentiality, then, in fact, the French

10   court might even compel production of those

11   documents.

12        But those issues are foreign law issues

13   that, again, are beyond the scope of what we

14   are doing today.  Today we are determining

15   whether or not Petitioner should be granted

16   leave to serve a subpoena on two nonparties to

17   a foreign proceeding who are unquestionably

18   found in Delaware who have documents that are

19   potentially admissible to the foreign

20   proceedings.

21        Unless Your Honor has further questions,

22   we'll rest on our briefs.

23            THE COURT:  I appreciate that,

24   Ms. Barday.  I do have some questions.

25            MS. BARDAY:  Okay.

1          THE COURT:  So on the first *Intel*

2     factor, help me understand.  So I understand,

3     Petitioner, you say the respondents are not

4     involved in the French litigation.  Were they

5     at one time parties in the French proceedings?

6          MS. BARDAY:  My understanding, Your

7     Honor, is they have never been parties to the

8     French proceedings.

9          THE COURT:  If they were not involved

10    and they were not parties, how do they have

11    documents regarding the reconciliation efforts

12    and negotiations?

13          MS. BARDAY:  So my understanding is

14    they were involved in the conciliation, so to

15    be clear, they were not involved in the first

16    conciliation.  As to the second conciliation,

17    we understand that Anchorage was a member of

18    the Steer Co. that participated in the

19    conciliation and PJT was a financial advisor to

20    the Steer Co.  They were not parties to French

21    court proceedings that are at issue here.

22          THE COURT:  Okay.  And is the -- is

23    the term "nonparticipant" narrowly construed

24    such that if folks were involved in, as you

25    say, the first reconciliation, how am I to

1    square that with being a participant versus a

2    nonparticipant?  Is that strictly construed by

3    the parties?

4              MS. BARDAY:  I think so because I

5    think the question about party is relevant;

6    right?  Because the question is over whom does

7    the French court have jurisdiction and over

8    whom could they compel discovery; right?  Much

9    like in an American bankruptcy proceeding you

10   could have creditors who are involved in a

11   mediation -- right -- who are not necessarily a

12   party, a formal party, to proceedings, and

13   their involvement in the mediation won't

14   automatically disclose them to discovery

15   obligations to other parties.

16             THE COURT:  Do you dispute the

17   Respondent's argument that they essentially

18   would have been -- keeping in mind there's some

19   difference in the entities, but they

20   essentially would have been subject to the

21   French court jurisdiction for purposes of

22   discovery?

23             MS. BARDAY:  So I think we do, but I

24   also think there isn't a formal discovery

25   process in connection with the French

1    litigation; right?  What you're saying is there

2    are arguments, among other things, by the Bank

3    of India saying that the privilege has been

4    waived and we ought to be entitled to these

5    documents.  We've seen, as you've seen in our

6    declaration, that the Court has ordered a

7    partial disclosure of some of the documents to

8    a prosecutor, and all the declarations seem to

9    agree that that are exceptions to the

10   conciliation confidentiality where a Court can

11   order production of documents if it feels that

12   it would be helpful to the Court itself.

13          THE COURT:  So in how many of the

14   cases where these sorts of -- this sort of

15   information has been sought, in how many cases

16   has it been permitted?

17          MS. BARDAY:  I'm sorry.  One more

18   time, Your Honor.  I'm not sure I understand

19   the question.

20          THE COURT:  No, absolutely.

21       Look, I understand there to be some

22   number of, maybe eight, collateral attacks

23   going on in France right now.  How many of them

24   were information like -- of the sort that you

25   seek here that is arguably subject to the

1      confidentiality?  And how many of those

2      proceedings was it sought, and how many was it

3      permitted?

4                MS. BARDAY:  So no discovery has been

5      sought, I understand, from the respondents

6      here; right?  So these documents are sought

7      from the first time -- for the first time from

8      the petitioners as to Anchorage and PJT.

9                THE COURT:  -- right?

10               MS. BARDAY:  I'm sorry.

11               THE COURT:  I apologize.  There were

12     similarly situated parties, other unsecured

13     creditors, in these collateral attacks that did

14     appear to be seeking information kind of like

15     what Petitioner is seeking here; right?

16               MS. BARDAY:  So I disagree with that.

17     I think there were two instances where people

18     sought specifically documents.  For example,

19     the conciliation agreement itself; right?  And

20     we are saying we don't need to have a fight

21     over the conciliation agreement itself.  You

22     would -- Respondents assert that is

23     confidential.  The right thing to do then would

24     be to withhold and log it; right?

25               We're seeking a range of documents

1        outside of the conciliation procedure, and

2        those documents have not been sought before.

3              THE COURT:  I guess two points.  I

4        understood in your briefing some acknowledgment

5        by Petitioner that negotiations are -- everyone

6        can agree that those are confidential as they

7        relate to the conciliation procedure.  And I

8        understood that argument to be kind of drawing

9        a distinction between negotiations and other

10       things related to the conciliation.  Help me

11       square that with, I guess, this apparent

12       confidentiality of the agreement itself.  So

13       it's not just negotiations.  It's negotiations

14       plus agreements?

15             MS. BARDAY:  So I think it's -- I

16       guess if you think about it in the context of a

17       mediation, which is how I think about it --

18       right -- it's the mediation reports.  So it's

19       the briefs submitted, the paperwork submitted

20       in the connection with the mediation.  It's the

21       things around the mediation, around the

22       conciliation -- right -- that relate to the

23       settlement.

24             So if, for example, I go into mediation

25       and I send an e-mail to a third party during

1    the mediation and I say you're not going to

2    recover anything; right?  I know I'm about to

3    win.  I don't think that is covered by the

4    privilege.

5         But I think that my communications with

6    the conciliator, with the mediator, the briefs

7    that I may have submitted in connection with

8    it, and the formal agreement itself is what we

9    are seeing from the submissions of the

10   intervenor, those things are privileged.  And

11   even then -- privileged confidential.  And even

12   then, the confidentiality gets qualified by an

13   absence of third-party disclosure; right?  So

14   if any of those things has been disclosed to a

15   third party, they become available; right?  The

16   confidentiality no longer applies.

17        And if you look at the submission of

18   Orpea yesterday, the French court decision says

19   that the court case had disclosed the same

20   information.  This was the same information

21   contained in the court approval decision;

22   right?  There's no reason to believe that

23   anyone violated the confidentiality such that

24   might warrant the production of the underlying

25   documents.

1            THE COURT:  Okay.  I understood your

2    first point when you first began your

3    presentation about this is -- at this point,

4    we're just looking at whether the statutory

5    *Intel* factors are satisfied to the point a

6    subpoena can be served, so never mind about the

7    breadth and all of that.  I guess two kind of

8    questions about that.

9            I understand you to be acknowledging that

10   some of the matters that Petitioners seek are

11   covered by this or are at least very likely

12   covered by this confidentiality privilege.  And

13   under the statutorily factors plus the *Intel*

14   factors, confidentiality can be implicated via

15   the privilege inquiry or the permissibility

16   inquiry or the end route inquiry.  And all of

17   those are threshold questions that the Court

18   has to satisfy itself of before it can permit

19   service of the subpoena.  One could argue that

20   your argument essentially asks me to ignore all

21   of those inquiries, permit service, and tell

22   the parties to work it out.

23           Can you respond to that and help me

24   understand how I should set aside all of these

25   concerns of privilege and confidentiality and

1          permit service?

2                    MS. BARDAY:  Sure, Your Honor.  So

3          first, I would say I think that all

4          subpoenas -- right -- are likely do in the

5          first instance -- whenever you ask for all

6          documents, some of those documents are going to

7          be covered by some privilege or some

8          confidentiality; right?  That's just the way

9          the subpoenas work.  If we look at the *Biomed*

10         case, which we cited in our brief, the *Biomed*

11         case from the Third Circuit pretty clearly

12         says -- it reversed the District Court denial

13         leave to serve and said it was erroneous to

14         turn down the discovery request flat without

15         requiring the parties to negotiate over cutting

16         down the request and said specifically that as

17         to concerns relating to burden, that the

18         respondent has to proffer empirical evidence

19         that the request would be too burdensome;

20         otherwise, generalized concerns that some of

21         the documents may be covered by some privilege

22         or some confidentiality isn't enough; right?

23              Because also we don't know right now is

24         it five documents?  Is it 5,000 documents?  Is

25         it of what; right?  Is it five documents,

1    100,000 documents; right?  We don't know.  So

2    far what we've heard is that it would be

3    burdensome, but we heard that only in

4    conclusory terms without any meat on the bones

5    in terms of what that burden actually looks

6    like.

7                THE COURT:  Certainly, I appreciate

8    that argument, but, you know, there is a

9    difference -- and I think you can acknowledge

10   the difference between the end inquiry of

11   burden versus the threshold inquiry of

12   privilege.  I think that's where I'm having

13   trouble, is this isn't just a meet-and-confer

14   over narrowing the scope such that you're not

15   asking for a million pages of documents, you're

16   asking for 500,000.  This is, are you asking

17   for things that either implicates the privilege

18   inquire, the permissibility inquiry, or the end

19   route inquiry?  We don't even get to burden

20   yet.

21               MS. BARDAY:  So we are not -- we're

22   not seeking documents that fall within the

23   conciliation confidentiality itself right now;

24   right?  But the *Intel* inquiry doesn't ask about

25   whether any of these documents would be

1    admissible; right?  It asks whether the foreign

2    court is responsive and open to the possibility

3    of considering these documents, regardless

4    whether or not a specific court would admit a

5    specific document.  And we believe that as to

6    both of our requests involving the documents

7    that would fall -- that would be covered by

8    that satisfy the second *Intel* factor.

9           THE COURT:  Let me come at this a

10   different way then.  Why is this an answer to

11   this question that, listen, Petitioner needs to

12   go strip out from its request all of the stuff

13   that implicate this confidentiality and

14   privilege concern and then try again?

15          MS. BARDAY:  Sure.  And I think the

16   answer is because -- let me see if I can pull

17   up a copy of our spin here -- because I think

18   there are a number of requests that look like

19   they may implicate the conciliation

20   confidentiality, but, in fact, don't; right?

21          For example, I think there's not a real

22   question that even in the conciliation

23   agreement itself were disclosed to a third

24   party, the French court seems to way and we

25   agree that's a waiver.  We're entitled to see

1      that; right?  If you've e-mailed it to the

2      press, if you have otherwise not treated it as

3      confidential consistent with the conciliation

4      confidentiality; right?

5          So we cannot know today whether, for

6      example, we asked for -- our request three here

7      is all documents and communications concerning

8      the first conciliation procedure.  We cannot

9      know the extent to which that request is

10     coterminous with documents Respondents would

11     assert are confidential under this procedure

12     because there may very well be third-party

13     communications.  There may very well be

14     internal communications that don't fit the bill

15     of what precisely the privilege the

16     confidentiality covers; right?

17         There certainly are -- the time period in

18     which we've requested documents goes far before

19     and long after because there are wide range of

20     documents we're requesting.  So it could be

21     that they were talking about, you know, the

22     thought that maybe they want to try to get a

23     conciliation procedure so it would fit request

24     number three but would not, in fact, fit under

25     the limitation under French law that the

```
1       various declarations recognize.
2              THE COURT:  Remind me -- and you may
3       have said this before, and if so I apologize
4       for asking you to repeat yourself -- how many
5       of these sort of collateral attack proceedings
6       that implicate the petitioners remain.  How
7       many are left?
8              MS. BARDAY:  So there is an appeal
9       from one of the two decisions -- I'm sorry,
10      Your Honor.
11             THE COURT:  Set the appeal aside for
12      now.  Eight were filed.  How many were rejected
13      or dismissed?
14             MS. BARDAY:  Off the top of my head,
15      my understanding -- and I want to confirm my
16      belief -- there are four including the appeal.
17             THE COURT:  Four including the
18      appeal.
19             MS. BARDAY:  And certainly we can
20      confirm so that we make sure we have that
21      number right.
22             THE COURT:  What's the timeline like
23      for the Courts in France to address the four
24      remaining including the appeal?
25             MS. BARDAY:  I don't know that we
```

1    have specific clarity on the timeline.  My

2    understanding of the appellate deadline for the

3    other of the two decisions that were submitted

4    yesterday is that there may be up to something

5    like 70 days for people to notice an appeal and

6    that it could take months after that to

7    adjudicate it once it's done, but it's not

8    clear to me that we have a timeline

9    specifically in terms of when we will have a

10   final decision in France at this juncture.

11            THE COURT:  Understood.  And putting

12   aside the appellate process, what has been the

13   kind of ballpark time, if you can give me one,

14   of between when these collateral attacks are

15   filed and when the Court -- not the appellate

16   court, the, I don't know, trial court, for lack

17   of a better word -- has made some sort of

18   decision?

19            MS. BARDAY:  I'm not sure,

20   unfortunately, Your Honor, that I know the

21   answer to that question, but we'd be happy to

22   inquire with our French colleagues and refer --

23   I do -- my understanding is that the sort of

24   next set of events, the next hearing maybe, is

25   towards the end of November of this year.

1           THE COURT:  Okay.  Well, what I guess

2      what I'm kind of wondering here is if the

3      French proceedings are mostly in the late

4      stages and/or in appeals, does that reduce the

5      usefulness of the discovery sought?  Does it

6      reduce it enough that the "for use in a foreign

7      proceeding" threshold requirement is really no

8      longer satisfied in a meaningful way?

9           MS. BARDAY:  Yes, Your Honor, so it

10     doesn't.  And it doesn't because French

11     proceedings, unlike American proceedings, are

12     open to evidence on appeal, and, in fact, a

13     number of 1782 applications -- certainly we

14     could submit a list of those to the Court if

15     the court would like to review other cases

16     where the evidence has been submitted on

17     appeal, but it is not uncommon for petitioners

18     to seek evidence, even for use just in an

19     appeal because of the way that the French

20     appellate process works or foreign appellate

21     processes generally.

22          It's also true -- you'll see reference in

23     the letter yesterday, too, to fees being

24     awarded and the suggestion is that this is some

25     sort of Rule 11 inquiry but it isn't.  There's

1    fee shifting.  Unlike the American rule where

2    parties bear their own costs, fees are

3    routinely awarded against the nonprevailing

4    party.

5              THE COURT:  Understood.  Okay.  Do

6    you have any authority from a French court or

7    something similar where conciliation documents

8    have been either held to be discoverable or

9    admissible?

10              MS. BARDAY:  So I don't believe we

11    do, Your Honor, other than the decision that

12    was submitted yesterday which suggested that

13    had the confidentiality been violated, they

14    would have been admissible.  I would say we

15    have a number of decisions, and that's on page

16    15 of our opening brief, where -- that identify

17    French Courts' general receptivity to

18    documents, and I don't believe there are any

19    cases cited by the respondents or the

20    intervenor where these documents specifically

21    have been excluded.

22              THE COURT:  Okay.  I guess just one

23    last point here.  Respondent has made the point

24    that Petitioner, essentially, hasn't done a

25    good enough job identifying a proceeding for

1    which proceedings you seek the discovery.

2    What's your response to that?

3                MS. BARDAY:  So we disagree; right?

4    There are a number of open proceedings in which

5    the Courts would accept evidence, could accept

6    evidence, and could accept this evidence.  It's

7    not necessary for us to say we are seeking an

8    e-mail from July 12, 2023, from so-and-so to

9    submit in connection with this appeal; right?

10   These -- we've identified the specific

11   proceedings in which we would seek to submit.

12   There are also -- there are a number of cases

13   where the Courts have not even required an open

14   proceeding in the foreign jurisdiction.  It is

15   enough to reasonably contemplate a proceeding

16   in order to obtain 1782 discovery to

17   substantiate your claims.

18                THE COURT:  Understood.  Could the

19   petitioners have made a request either through

20   pre discovery or by a motion to the Court in

21   France to get the same material they now seek

22   in this court?

23                MS. BARDAY:  So the French discovery

24   rules are different.  They do not preclude

25   access to this information, but the Third

1    Circuit has been very clear that there is no

2    foreign exhaustion requirement, that even if

3    the documents are obtainable in a foreign

4    pleading, a petitioner seeking discovery from

5    U.S. entities located in the district where the

6    petition is filed need not have sought to

7    resort to any foreign proceeding to obtain

8    though documents before coming to American

9    court, and that's, among other things, the

10   *Biomed* case.

11            THE COURT:  No, I absolutely

12   understand that point, but could petitioners

13   have made the request?  And whether and what

14   weight I give that is a different matter, and

15   I'm certainly familiar with the *O'Keefe* case,

16   but as a matter of fact, could they have sought

17   the discovery through pre discovery or through

18   a motion to the court?

19            MS. BARDAY:  Sure.  So we don't

20   believe so because PJT and Anchorage are not

21   parties to the proceedings.  So there isn't a

22   vehicle with a non-party who's a foreign entity

23   to seek that kind of discovery.

24            THE COURT:  Could you have obtained

25   it from the entities that you have defined as

1    parties to those proceedings?

2              MS. BARDAY:  No, because PJT and

3    Anchorage have a number of documents that the

4    parties to those foreign proceedings won't

5    possess; right?  They have, among other things,

6    internal e-mails that the parties to those

7    proceedings wouldn't have ever seen or had

8    access to.

9              THE COURT:  If they wouldn't have

10   ever seen them or had access to them, does that

11   have bearing on relevance that I need to

12   consider?  If the parties in the French

13   proceeding regarding the conciliation and the

14   eventual -- what I would call a plan here under

15   an American bankruptcy system -- didn't see

16   what was going on with the third parties.  Why

17   is that relevant to whether that plan was

18   unlawful and unlawfully achieved?

19             MS. BARDAY:  So there are, I guess, a

20   couple different ways, and I'll be happy to

21   opine on them, and you'll tell me if that

22   answers your question.

23        So look.  A financial advisor may be

24   empowered to go out and contact third parties,

25   may not contact the entity retaining it when it

1     goes out to talk to those third parties.  It

2     may say a whole bunch of things to those third

3     parties that it later reports to somebody, but

4     maybe people didn't see those communications in

5     the first instance.  Financial advisors are

6     providing advice.  That a financial advisor's

7     advice has changed over time can be relevant.

8     It's possible somebody has been pressured to do

9     something and you see that action in internal

10    communications at that level, but you won't see

11    it, necessarily, from the parties to a deal for

12    example; right?

13         But one of the allegations that the

14    petitioners have repeatedly made is that Steer

15    Co. shut them out of the process while talking

16    to other people, potentially, so in order to

17    substantiate that claim that Petitioner's

18    unsecured creditors weren't privy to a bunch of

19    communications that maybe some of the other

20    creditors were privy to, regardless of whether

21    or not the intervenor Orpea was a party to

22    those shouldn't impact the ability to seek that

23    discovery.  If the standard were one of the

24    parties to the litigation has to always have

25    seen or observed what was happening, we

1  wouldn't have third-party discovery at all.

2          THE COURT:  Okay.  All right.  I

3  understand.

4          I think one last question.  Help me --

5  just from your perspective, help me square a

6  case like *O'Keefe* with the end run concern, and

7  especially in a case like this where we have

8  Respondents essentially arguing that this is a

9  definitional end run around foreign proceedings

10  because they argue Petitioner could never get

11  this stuff in France and even if they could, it

12  would never be admissible.  So there's some

13  tension there between this notion of there's no

14  requirement to exhaust but on the other hand

15  here it seems like, you know, at least

16  Respondent's argument is but they could never

17  get this stuff anyway and this is just coming

18  to a Court in the United States to avoid the

19  restrictions in France.  This is a classic end

20  run.

21          Help me square those two points.

22          MS. BARDAY:  Sure.  I'll do my best.

23          So first, I would note that there is the

24  proverbial battle of the affidavits here.

25  The -- there are two declarations in this case

1    and both maintain that documents that could be

2    obtained through 1782 could be admissible in

3    France, so this is a little bit of a "he

4    said/she said" in terms of what's actually at

5    issue.

6         Two, the specific tests, as I know Your

7    Honor knows but I will say it again for my

8    benefit, is not whether a specific document is

9    admissible.  The question is whether the Court

10   is generally receptive to discovery altogether.

11        Three, we're not just seeking these

12   conciliation documents.  We're seeking a bunch

13   of documents that aren't covered by the

14   conciliation privilege.  So conciliation on the

15   one hand; right?  But lock up, safeguard

16   proceedings, communications with third parties,

17   none of these are covered by the conciliation

18   privilege.

19        And my last point is we are not

20   seeking -- so it's not clear that the French

21   court has squarely ruled on the issue, which is

22   the standard in these cases; right?  But we're

23   not seeking -- look, the French Court says, for

24   example, conciliation agreement, not

25   admissible.  We're saying, okay, we're not

1    seeking that.  That's just the sort of thing

2    subject to attorney-client privilege that you

3    could log or through a meet-and-confer process

4    you could figure out what is not going to be

5    logged; right, Your Honor?

6         But it doesn't mean that the requests for

7    leave to serve a subpoena ought to be denied or

8    that simply because some of the documents might

9    cover something that is arguably privileged --

10   and by the way our declarations submitted from

11   our French lawyer say that the conciliation

12   privilege is far from settled in France, so

13   while we are taking, for the sake of

14   argument -- the petitioners say for the sake of

15   argument, let's say assume these conciliation

16   documents truly are privileged.  It's not clear

17   any of the decisions from the French court have

18   gone so far to say the privilege -- here are

19   the contours of the privilege.  Here are the

20   absolute limits.  Here's how it works.

21        What we know is the Court is saying for

22   these documents specifically requested that

23   were used in the conciliation, I won't give

24   them to you unless you can show me, in effect,

25   that there was a waiver of confidentiality over

1       these documents.  That's the only ruling we

2       have.

3            Nothing Petitioners are doing seeks to

4       circumvent that ruling.  We're saying, okay, as

5       to those documents, we're not -- we understand;

6       right?  But as to everything else, there is a

7       whole world of documents to which we are

8       entitled and to which the French courts would

9       be open regardless of whether or not they are

10      specifically requested or specifically admitted

11      down the line or not.

12           THE COURT:  Okay.  I have one last

13      question.

14           MS. BARDAY:  I do, Your Honor, want

15      to be responsive but there were a lot of pieces

16      to that question.  Did I respond?

17           THE COURT:  No, I think you did, but

18      it raised another question in my mind, and that

19      is, look.  Now I understand it's not so much a

20      dispute -- and I won't -- I don't want to

21      overstate what you said, and so I'm not meaning

22      to give short shrift to it, but there is some

23      dispute at least about there is a conciliation

24      privilege here but there's a dispute about how

25      broad it is, how absolute it is, and what it

1      covers and what it doesn't.

2           Let's say that I authorize you to serve

3      the subpoena, and you serve the subpoena, and

4      then, I think, fairly predictably what's going

5      to happen is there is then going to be a

6      dispute about the scope of the privilege.  And

7      then it seems to me that what I've been asked

8      to do is rule or interpret and try to apply

9      French law, which I -- brings me back to the

10     end run concern.  What is a Court supposed to

11     do in that situation?  Is it supposed to wade

12     into the nitty-gritty of French law?

13          MS. BARDAY:  So, Your Honor, I think

14     the great weight of caselaw says it is not,

15     that weighing into this -- and that's the line

16     you see in the cases is battle by affidavit in

17     these situations.  So the great weight of the

18     caselaw says that a U.S. Court should not wade

19     into that dispute.

20          I believe that the parties are in

21     agreement here, although I'm sure somebody will

22     correct me if I'm wrong.  We believe the

23     question of how broad the confidentiality is is

24     a question for the French court; right?  But

25     again, there are a whole bunch of documents

1    that don't implicate the privilege at all, and

2    the questions about how broad the conciliation

3    confidentiality is shouldn't hold up those

4    documents in the meanwhile.

5         THE COURT:  I guess I was envisioning

6    a situation where they -- either Respondent

7    says request number one, for example, not a

8    reality, but for example, those are squarely

9    targeting these documents that we, as

10   Respondents, believe fall right within the

11   conciliation privilege and Petitioner says no,

12   they don't.  And so Petitioner files a motion

13   to compel Respondent to produce the documents

14   to request number one.  What happens then?

15        MS. BARDAY:  So in my personal view,

16   the right answer here is that those -- those

17   documents that the respondent contends are

18   privileged got logged in a privilege log and a

19   French Court is then able to decide whether or

20   not they ought to be produced or not, but

21   questions about does French law cover this,

22   that, or the other thing, again, is not -- we

23   don't believe it's an issue for this Court.

24        THE COURT:  So Petitioner would not

25   be coming to me with a motion to compel with

1      the basis being the parties disagree about the

2      scope of the privilege; is that right?

3              MS. BARDAY:  I believe that's

4      correct, Your Honor.  That's what I'm trying to

5      say.  I don't think that we believe -- and I'm

6      hopeful that Respondents, I have read their

7      brief correctly to say this is an issue for the

8      French Court, not the U.S. Court.

9              THE COURT:  Thank you very much.

10     I'll go ahead and turn it over to, I believe,

11     Mr. Lombardi now, please.

12             MR. LOMBARDI:  Good afternoon, Your

13     Honor.  This is Stuart Lombardi of Willkie,

14     Farr, and Gallagher for the respondents.

15             We, of course, Your Honor, have a

16     fundamental disconnect on the scope of the

17     privilege as it applies to the subjects of the

18     subpoenas that petitioners asked you to issue.

19     Petitioners are asking this Court to issue

20     subpoenas about subjects privileged in their

21     entirety under French law, and they want that

22     information to support their collateral attacks

23     on a French bankruptcy plan that's the result

24     of a court-supervised mediation that passed a

25     vote of all creditors, and it was approved by a

1       French Court.  And petitioners are unhappy with

2       that Court approval, so they and certain other

3       creditors have been challenging it in French

4       courts for about a year.  And they and their

5       allies have lost every merits decision to date,

6       and the French Courts have denied parties

7       access to the same type of information the

8       petitioners seek here.  So they come to the

9       U.S. and they ask you to reach a different

10      result, but that would be a misuse of Section

11      1782 to issue the subpoenas at all.

12          And I was planning to briefly cover three

13      subjects, but I invite you to please jump in

14      with questions at any point.  I'd want this to

15      be useful to you rather than to hear myself

16      talk.  The first subject was I was going to set

17      the table briefly with the statutory text and

18      purpose as identified by the Supreme Court in

19      *Intel* and *ZF Automotive* because that purpose is

20      fundamental to answering the question of

21      whether it would be proper to issue the

22      subpoenas.

23          And then second I was going to identify a

24      couple fundamental errors of law in the reply.

25          And then third I was planning to speak

1    briefly to one of the statutes, and *Intel*

2    factors two and three in particular require

3    that the application be denied.  We are

4    standing, of course, on all of the arguments in

5    our opposition, but I'm planning to focus on

6    the conciliation privilege today because it's

7    dispositive under the statute.  And if you

8    reach the *Intel* factors, which you don't need

9    to do, it's dispositive under factors two and

10   three.

11       So on the first subject, Your Honor, the

12   statute is clear, of course, that discovery

13   cannot be granted in violation of any legally

14   applicable privilege.  Those are the statutory

15   words.  And that's an absolute and immutable

16   rule.  It is clear from the face of the statute

17   and as is clear from the purpose of the statute

18   as articulated by the Supreme Court in the

19   *Intel* decision and in *ZF Automotive*.

20       In *Intel*, the Supreme Court identified

21   twin aims of the statute.  The first "providing

22   efficient assistance to participants in

23   international litigation," and the second is

24   "encouraging foreign countries by example to

25   provide similar assistance to our courts.  And

1  the Supreme Court went on to write, "We note at

2  the outset and count as significant that

3  Section 1782(a) expressly shields privileged

4  material."  And those quotes are at 524 U.S.

5  241 at pages 252 and 260.

6       And then last year in *ZF Automotive*, the

7  Supreme Court, again, had an opportunity to

8  address the statute, and, again, it wrote

9  directly to the statutory purpose.  The Supreme

10 Court explained "From the start, the statute

11 has been about respecting foreign nations and

12 the governmental and intergovernmental bodies

13 they create."  That's at 142 Supreme Court

14 2088.  And the unanimous court, 9-0, went on to

15 write, "The animating purpose of Section 1782

16 is comity.  Permitting federal courts to assist

17 foreign and international governmental bodies

18 promotes respect for foreign governments and

19 encourages reciprocal assistance."  That's at

20 142 Supreme Court 2088.

21      And that purpose, Your Honor, of course,

22 would be violated if a U.S. Court ordered

23 discovery in violation of French privilege,

24 discovery that French courts don't want,

25 discovery of the same type that French courts

1   have already denied, not just in any cases, but

2   in the very underlying cases that are

3   supposedly the predicate, the basis, for the

4   application.

5          And even if the statutory requirements

6   were met, and they aren't, this Court wouldn't

7   have to grant the application and shouldn't

8   because *Intel* factors two and three are

9   dispositive here.  Factor two is whether the

10  foreign court would be receptive to the

11  discovery.  We don't have to guess about that.

12  And factor three is whether the application is

13  an attempt to circumvent foreign

14  proof-gathering restrictions or policies, and

15  that couldn't be clearer in in case.

16          THE COURT:  Mr. Lombardi, before you

17  go on to the *Intel* factors, let me go back to

18  the statutory factors.  I understand, and maybe

19  I'm wrong, but of the points that petitioner is

20  making is there is a difference between the

21  privilege contemplated by 1782(a) and

22  confidentiality as contemplated by the French

23  courts.  Do you have any authority to point me

24  to that would bolster your argument that

25  confidentiality and privilege should be treated

1    as one and the same for purposes of this

2    inquiry?

3              MR. LOMBARDI:  Our authority, Your

4    Honor, is the declaration of our expert in

5    French law.  The conciliation privilege here

6    really is a privilege under French law and is

7    best understood as a privilege.  And he isn't

8    just any lawyer writing to the subject as noted

9    in the introductory paragraphs of his

10   declaration.  He is one of the crafters of the

11   provisions of the bankruptcy code that are

12   being applied in the foreign cases.  He's a

13   foremost expert in the field.

14        I should also note that he is an

15   independent expert here.  He doesn't represent

16   respondents or Orpea in any of the foreign

17   proceedings, and that's quite different than

18   Petitioner's foreign law declarant, who

19   represents Petitioners in the foreign

20   proceedings.  That declarant isn't an unbiased

21   third-party expert.  She's an advocate.

22             THE COURT:  Okay.  All right.  I

23   understand that point.

24        And then to this point about ensuring

25   that 1782 is used in a way that is, to

1    paraphrase your words, respectful of the

2    underlying foreign proceedings law, I want to

3    make sure I'm following it.  You're, in this

4    case, limiting that to these -- or focusing, I

5    should say, on the substantive protection of

6    privilege and confidentiality because,

7    certainly, I have seen cases, and I'm sure you

8    have as well, where Courts have permitted 1782

9    discovery precisely because the foreign court

10   doesn't have a mechanism for obtaining the

11   discovery.  Does that make sense?

12            MR. LOMBARDI:  Yes, that's exactly

13   right, Your Honor, and that distinction, you

14   pick -- put your finger right on it, is a

15   critical distinction.  And the Second Circuit

16   drew that distinction in *Nice v. Buter*, 793

17   F.3d 291, Reporter page 303, note 20.  The

18   Court drew a distinction between discovery

19   simply being unavailable, and those are the

20   cases you were referring to, versus discovery

21   being affirmatively prohibited, and we're in

22   that second category here.

23            THE COURT:  Well, what am I to do

24   when Respondents say discovery is affirmatively

25   prohibited, Petitioners say no, it isn't, and

1  we're faced with a classic battle, expert

2  battle by affidavit?  What am I to do under

3  that situation under the 1782 framework?

4  MR. LOMBARDI:  That goes, Your Honor,

5  to one of the two fundamental errors in the

6  reply.  To answer your question first, the

7  statutory mandate here that discovery may not

8  be required in violation of any privilege has

9  to trump because that's the absolute rule.  The

10  statute doesn't require you to grant the 1782

11  application at all.  The statute is

12  discretionary.  The Court may grant.  But the

13  prohibition on requiring the production of

14  privileged information is absolute.  The Court

15  may not require production of privileged

16  information.  So if there is a real doubt here,

17  the application must be denied, either under

18  the statute or under *Intel*.

19  That gets to the fundamental -- one of

20  the fundamental errors I referred to in the

21  reply.  Petitioners argue that Respondents have

22  the burden of presenting "authoritative proof"

23  that the conciliation privilege prohibits the

24  requested discovery, and they cite the Third

25  Circuit's decision in *Chevron* for that, but

1      *Chevron* does not contain that phrase.  Those

2      words are nowhere in the opinion.

3          I think they're referring to the Third

4      Circuit's unpublished decision in *O'Keefe*,

5      which Your Honor referred to earlier.  But that

6      decision doesn't stand for that proposition

7      either.  The phrase "authoritative proof"

8      appears in the decision, but the Third Circuit

9      was quoting the District Court.  The Circuit

10     wasn't passing on the standard itself.

11         And the Third Circuit didn't apply that

12     standard and didn't have to decide whether that

13     standard was correct because the parties didn't

14     dispute that that was the standard that should

15     apply in that case for purposes of the second

16     *Intel* factor, and that's a critical

17     distinction.  The second *Intel* factor is

18     whether the foreign court would be receptive to

19     the discovery.  And some Courts have thrown

20     their hands up in a situation where there's a

21     battle of the experts where one expert is

22     saying, well, the foreign court isn't going to

23     want this discovery and another expert is

24     saying the foreign court will.  And Courts have

25     indicated -- U.S. Courts have indicated that

1          they shouldn't have to peer into the heads of

2          the foreign court for guessing whether the

3          foreign court will ultimately admit the

4          evidence.

5               That's not the question for *Intel* three.

6          For *Intel* three, the question is whether the

7          application is an attempt to end run foreign

8          privilege, and the statute is clear that that

9          just isn't allowed.  It can't be done.

10                   THE COURT:  I certainly understand

11          the point for *Intel* three.  For *Intel* two,

12          isn't the inquiry not whether the -- as to

13          foreign court receptivity, it's not whether the

14          foreign court would admit the specific evidence

15          sought here but whether they are generally

16          receptive to 1782 assistance?

17                   MR. LOMBARDI:  That is often how that

18          standard is framed for the very purpose of not

19          having to peer into the court's head.  And that

20          goes to the fundamental purpose of the statute;

21          right?  Reciprocity.  And in our view, that

22          purpose just is not served by requiring

23          production -- by issuing subpoenas that seek

24          production of information that is privileged

25          under French law.  That's not going a serve a

1        reciprocity purpose.  It's not going to make

2        French courts happy and make them inclined to

3        create similar legislation allowing discovery

4        for U.S. actions.  It's violative of the entire

5        foundation of the statute.

6                THE COURT:  Assuming that Petitioner

7        is correct here that there's some amount of

8        discovery sought within the subpoena that

9        doesn't fall within the conciliation privilege,

10       Respondent made an argument that, broadly

11       generalizing, criticized Petitioner for not

12       having availed itself of whatever discovery

13       procedures are available in France, sitting on

14       its hands, and running to the U.S. Court.  But

15       doesn't *O'Keefe* say petitioners aren't required

16       to do anything before coming to a U.S. Court?

17               MR. LOMBARDI:  There's no exhaustion

18       requirement, but you don't have to ignore the

19       fact that they sat on their hands.  And you can

20       ask why they did that.  And we submit it's very

21       clear.  They did that the because the French

22       courts never would have given them the

23       discovery that they're seeking here.

24               THE COURT:  Let me ask you this:  If

25       there are categories of documents or parts of

1    the request that don't have any bearing on the

2    confidentiality privilege that we've been

3    discussing, would Respondent agree to produce

4    those sorts of documents?

5              MR. LOMBARDI:  Your Honor, we think

6    that that issue should not be reached at all

7    because the subpoenas can't be issued.  And for

8    the reasons laid out in our expert's

9    declaration at DI 22, the entirety of the

10   subpoenas, in our view and our expert's opinion

11   under French law, the entirety of the subpoenas

12   seek privileged information.  We're not just

13   saying that some requests, some categories,

14   some of what we have.  It's everything, as a

15   result, the application can't be granted and

16   shouldn't be granted.

17             THE COURT:  But is the conciliation

18   privilege really quite as broad?  I mean, I

19   think -- I understand that there's a reasonable

20   dispute between the parties, but I suppose I

21   should ask.  Is it Respondent's position that

22   anything having to do with the conciliation,

23   even involving third parties, even involving

24   folks who weren't within the cloak of the

25   mediation process, so to speak, all of that is

1      subject to the privilege?

2              MR. LOMBARDI:  It's our position that

3      Respondents believe that everything that they

4      have would ultimately be covered by the

5      privilege.  However, if they went through reams

6      and reams of paper, is it possible that they'd

7      find two pieces of paper and a napkin?  Maybe.

8      We never know, and of course they haven't

9      undertaken the massive burden of doing that.

10     But given the purpose of the statute and given

11     that the fourth *Intel* factor is itself burden,

12     it would be inappropriate to require them to do

13     so, particularly when you step back and view

14     the very clear purpose of the application here,

15     which is to seek discovery that not only

16     wouldn't be available in French courts but that

17     French courts would affirmatively prohibit from

18     being provided.

19             In our view, even if there is some doubt

20     in your mind that maybe there are a few pieces

21     of paper that could be found at the end of the

22     day, we don't know, when you weigh that against

23     the undue burden of conducting that search to

24     identify a few pieces of paper, it's just not

25     appropriate to issue the subpoenas.

1           And, Your Honor, Petitioners haven't

2     actually identified any category of documents

3     that Respondents believe that they would have

4     that Petitioners don't already have that would

5     be covered by the subpoenas.  Petitioners point

6     to some things like press releases and

7     information that's been publicly disclosed, but

8     they don't need an order from you to get that.

9     That information is out there, and we believe

10    the rest of what exists is privileged.

11          THE COURT:  On the issue of burden,

12    Petitioner Ms. Barday made the point that

13    respondents have to do more than just say this

14    is going to be a lot and have to come forward

15    with specific facts about the number of

16    searches, the number of documents, the amount

17    of time.  What do you say to that?

18          MR. LOMBARDI:  What we say to that is

19    we can't do that when we haven't been pointed

20    to a single category of non-privileged

21    documented that we would have.

22          THE COURT:  Okay.  All right.  I

23    understand the bigger point there.  What else

24    would you like to say on your, Respondent's,

25    part?

1          MR. LOMBARDI:  One other core error

2     in the reply, Your Honor, on page seven,

3     Petitioners claim that in *ZF Automotive*, the

4     Supreme Court found no error in the District

5     Court's grant of a Section 1782 application and

6     ordered deferring consideration of privilege

7     issues "as necessary and appropriate as

8     discovery proceeds."  In other words, they

9     suggest that the Supreme Court said it was fine

10    to kick the privilege issue down the road, to

11    grant the application and deal with privilege

12    religion later in the response to the subpoena.

13          That's just not right.  *ZF Automotive*

14    doesn't say and can't say that because the

15    Supreme Court unanimously held in that case

16    that the discovery application could not be

17    granted, so there were no subpoenas to respond

18    to.  The application was denied in its

19    entirety.

20          With that, Your Honor, I'm happy to

21    answer anymore questions.

22          THE COURT:  I appreciate that.  I

23    think I had asked the petitioner if she had any

24    -- Ms. Barday if she had any sense as to when

25    the remaining collateral attacks might be

1    addressed by the French court in the first

2    instance, not counting any appeals.  Do you

3    have a sense of the timing?

4              MR. LOMBARDI:  I would defer, Your

5    Honor, to the intervenor, Orpea, who are on

6    here.  They are in those proceedings, and I

7    think they're in the best position to answer

8    that.  I don't want to get it wrong.

9              THE COURT:  Understood.  Thank you,

10   Mr. Lombardi.

11        Ms. Chung, would you like to speak on

12   behalf of the intervenor, please?

13             MS. CHUNG:  Yes, good afternoon, Your

14   Honor.  And on behalf of Orpea, we would LIKE

15   to -- we've come in here primarily, Your Honor,

16   because when you look at these requests that

17   have been propounded to Anchorage and PJT, it

18   doesn't matter that Anchorage and PJT have not

19   been the subject of similar requests in the

20   French proceedings because these documents

21   target information and material and documents

22   about Orpea's restructuring, Orpea's

23   negotiations, its involvement in the

24   conciliations and in the lockup proceedings and

25   consolidated safeguard proceedings.  So it will

1    be a fallacy, Your Honor, to try and draw the

2    distinction to say, well, because these

3    entities are not involved in the French

4    proceedings, it's entirely acceptable to obtain

5    the discovery here.

6          What you have here, Your Honor, is a

7    classic end run because you have Petitioners

8    trying to seek documents from third parties,

9    documents that primarily belong to the

10   participant in the foreign litigation.  And so

11   what I'd like to go over, Your Honor, are the

12   four decisions where discovery has been sought

13   in France and where discovery has been

14   rejected.

15         And on the basis of the French

16   conciliation privilege which Mr. Lombardi

17   provided an overview of and these decisions, I

18   would submit, Your Honor, that this is not a

19   classic battle of the experts where Your Honor

20   has to throw your hands up in the air and say

21   I'm not required to do this.  Your Honor is

22   right.  You're not required to do this, but the

23   reason is because there's a Court in France who

24   is deciding all of these issues and has decided

25   a number of times that discovery should not be

1     granted because it would violate the sacrosanct

2     privilege of confidentiality that underlies

3     conciliation, and this is a privilege that

4     enables the debtor and creditors to come

5     together -- as the conciliator in these

6     proceedings has herself said, it allows the

7     debtors and creditors to come together and

8     negotiate in a climate of complete trust and

9     confidentiality and transparency, and that is

10    what needs to be protected here.  And it is not

11    the role of a U.S. Court to come in and preempt

12    or contradict decisions by the French courts on

13    these issues.

14         So on the four decisions that I would

15    like to briefly highlight, the first has to do

16    with what's known as an Article 145 proceeding

17    that was brought by several similarly situated

18    creditors seeking a judicial investigation of

19    Orpea and seeking a broad range of discovery in

20    that proceeding in order to substantiate the

21    claims that Orpea's restructuring has been

22    nothing but a fraud perpetuated by Orpea, the

23    conciliator, and other involved entities.

24         So we discussed this decision in our

25    briefing.  This was a case in which the

1    creditors actually sought a very broad array of
2    information, and so this is DI 26, and I'm
3    looking at page ID 975, but if you look
4    throughout this decision, the creditors are
5    asking to obtain documents or information that
6    they deem useful for carrying out their duties.
7    They're asking Orpea to provide this document
8    to a court-appointed expert to investigate
9    potential claims.  They're asking for Orpea --
10   they're asking for the expert to be given
11   authority to gather all information needed to
12   determine a series of issues that they believe
13   need to be investigated in order to determine
14   whether or not there has been a fraud
15   perpetuated on the minority creditors.  They
16   asked for authorization for the expert to
17   consult with conciliation agreement, and they
18   also ordered the parties to disclose to the
19   expert documents and information covered by the
20   confidentiality clause.  On top of that,
21   they're asking for information about reports,
22   independent financial reviews, documents
23   produced by Orpea to the commercial court of
24   Nantier [phonetic] to support their application
25   for approval of the conciliation.  They're

1    asking for disclosure of correspondence,

2    warrants, contracts, agreements relating to an

3    asset disposal plan that arose from the first

4    conciliation.

5        These are some of the requests that were

6    requested and denied by the Court on the basis

7    that these requests were overbroad and also on

8    the basis that these requests contravened the

9    conciliation privilege under Article 61115 of

10   the French Commercial Code.  That's just one

11   decision.

12       There's another decision involving one of

13   these creditors, Video Banca, where in separate

14   proceedings, Video Banca requested copies of

15   the first conciliation agreement, and that was

16   also rejected, and we discussed that in our --

17   in the Golsheiny [phonetic] affidavit as well.

18       Also, Petitioners have stated that they

19   have never sought discovery in the French

20   proceedings, but we know that in proceedings to

21   set the petitioners and others not only

22   situated creditors known as the support club

23   initiated in order to try to revoke the

24   Court's -- the French court's approval of the

25   first conciliation agreement, they did ask for

1      an expert to be appointed, and they asked for

2      this expert to be provided with all of Orpea's

3      accounting and financial information, including

4      forecasts, business plans, which have been

5      communicated to the Court as part of the

6      application for the approval to the

7      conciliation agreement.

8           And the Court rejected their request to

9      revoke the approval for the first conciliation

10     agreement and the Court also declined to grant

11     the request for the appointment of an expert

12     and the disclosure of information to this

13     expert as well.  That's the third decision.

14          And as we have -- we have this fourth

15     decision that was issued just last week.  The

16     petitioners mentioned that they have appealed

17     this decision, but I just wanted to note that

18     case only received notice of that appeal today,

19     but in any event, it doesn't change the

20     circumstances here.  Here you have SDI

21     requesting a wide range of documents relating

22     to the first conciliation and the second

23     conciliation and their restructuring, and the

24     Court has decided on the basis of the codified

25     confidentiality code relating to conciliation

1    that this information should not be granted.

2    We don't read the decision in the same way that

3    Petitioners suggest, saying that the Court is

4    opening the door to potential discovery.  This

5    is a definitive decision saying that such

6    information is protected by the confidentiality

7    privilege.

8         Now, the creditor in that action did

9    suggest that there might be waiver as a result

10   of the release of this information, some

11   information relating to the conciliation to the

12   press, but the Court rightfully held that

13   Orpea, as a public company, does have some

14   obligations to update shareholders in a limited

15   capacity about certain events relating to the

16   conciliation, and that's what Orpea did, but

17   that doesn't amount to any kind of waiver.

18   There isn't any further expectation that the

19   Court would award discovery on the basis of

20   these decisions.

21        So you have these four decisions that

22   really are a roadblock to any kind of discovery

23   being sought in the French proceedings and

24   should be a roadblock here because you don't

25   want to pit a U.S. court against French courts

1    that have decided repeatedly that this kind of

2    discovery in order to dig up possible

3    information about a potential fraud that has

4    been perpetuated -- which by the way has been

5    rejected as well by the courts -- it just

6    doesn't make sense here.

7         So, Your Honor those, are the four

8    decisions.  I would say that on this issue, you

9    are guided by some pretty helpful caselaw as

10   well that speaks to the third *Intel* factor, and

11   so there are a couple of cases that I wanted to

12   cover here.

13        The first case is the application of

14   Sygenta Crock AG which is 2022 Westlaw 1690832,

15   and this is a decision by Chief Judge Connolly

16   that was issued in May of 2022.  Here you had

17   an Indian entity that was considering bringing

18   patent infringement claims against another

19   Indian entity in India and the applicant sought

20   1782 discovery from a Delaware-incorporated

21   company.  Now, Judge Connolly denied the

22   request on the basis of the third factor.  He

23   looked at the requests, and he noted that these

24   requests appeared to be targeting documents

25   that relate primarily to the Indian defendant,

1    and he said in his decision this application

2    appears to be an attempt to substitute this

3    Court's discovery rules for Indian discovery

4    rules.  The applicant does not dispute that

5    GFP, who is the proposed defendant in the

6    foreign proceedings, has access to the

7    information that it requests from the 1782

8    recipient, so I am left questioning why the

9    applicant came to this court to get information

10   from the 1782 respondent rather than go through

11   the Indian court and employ Indian discovery

12   rules to get the same information from the

13   foreign party defendant unless it did so to

14   circumvent less favorable discovery rules.

15        That is precisely what is happening here,

16   Your Honor.  There's no other reason for the

17   applicants to be coming to Delaware to seek

18   discovery from two entities that just happen to

19   be incorporated in Delaware when it's clear

20   that the documents that they seek are within

21   the jurisdiction of the French courts.

22        And on that point, Your Honor, you had --

23   there had been a discussion about factor one of

24   *Intel* earlier.  While it was primary talking

25   about factor three here, I think factor one

1    needs to be clarified as well because the

2    question is whether or not -- and this is the

3    common case we cite -- the question is whether

4    or not the foreign court has jurisdiction over

5    the documents that are subject to discovery.

6        So it's not really a question of whether

7    or not there's jurisdiction over Anchorage or

8    PJT.  It's a question of does the Court, in

9    fact, have the power to compel the production

10    of these documents, and the answer is here yes,

11    the Court could -- the Court in France could if

12    it was satisfied that there were no

13    confidentiality provisions that would be

14    violated as a result of the production.  So

15    that's the *Sygenta* case.

16        I had mentioned the *Common Asteroid* case

17    earlier.  It's the same result.  The Court

18    ordered -- the Court denied a 1782 application

19    because it was very clear that the recipient of

20    the 1782 subpoena was being targeted even

21    though the discovery was not targeted at that

22    recipient but was targeted at the foreign party

23    who was involved in the litigation.  These are

24    just two of the cases.

25        Additionally, none of these cases state,

1    as applicants say in their reply, that you have

2    to show bad faith in order to satisfy the third

3    *Intel* factor and that it actually is a very

4    narrow factor.  That is a standard that has

5    been set up by Petitioners that is not

6    supported by the law.

7         But I would submit, Your Honor, that

8    there are some indications of bad faith here,

9    especially when you look at the petitioner's

10   opening brief and they say on page two of the

11   brief that the requested discovery does not

12   implicate any privilege or special protection

13   that would make it improper under French law.

14   We know now, only after the significant

15   briefing that the respondents and intervenor

16   have had to submit, that that is absolutely not

17   true, so coming to this Court and to make that

18   representation in light of all of the caselaw

19   in France regarding the conciliation privilege

20   is, I would submit, evidence of bad faith.

21        Finally, Your Honor, this is an important

22   issue because, as Mr. Lombardi mentioned, 1782

23   does exist for a reason, and it's -- it exists

24   in order to provide assistance to foreign

25   courts and encourage reciprocity.  We would not

1    be providing assistance to the French courts

2    here if we were issuing decisions that would

3    contravene their rulings.  This would be a

4    decision that would undermine the -- if the

5    decision was to grant discovery -- to allow the

6    service of the subpoena, this would undermine

7    the protections of the confidentiality rules

8    relating to conciliation, and there has been no

9    U.S. decision where 1782 discovery has been

10   granted in violation of the confidentiality

11   privilege.

12        And as I mentioned earlier, Your Honor,

13   there are a lot of Delaware companies that are

14   incorporated in Delaware and that were

15   operating around the world, including, in this

16   instance, with Orpea and PJT.  We don't want to

17   create a situation where these Delaware

18   entities would be subject to 1782 discovery

19   solely because they are incorporated here

20   regardless of whether or not they are the

21   ultimate subject of litigation elsewhere.

22        So for these reasons, Your Honor -- and

23   we support -- we support Anchorage and PJT's

24   arguments with respect to all of the other

25   *Intel* factors and the statutory factors, but we

1    in particular wanted to explain to this Court

2    why this application is truly an offense to the

3    French courts and the decisions that have been

4    issued thus far and should be denied.

5         Thank you.

6         THE COURT:  Thank you, Ms. Chung.  I

7    appreciate your presentation.  Can you address

8    the question as to timing on the remaining

9    actions.  I think there are three or four

10   pending before the French court.  How long

11   until you -- what is your best guess until they

12   issue a decision that might affect this Court's

13   decision?

14        MS. CHUNG:  Yes, Your Honor.  So I

15   understand that there are two proceedings that

16   are still pending in the first instance.  One

17   of these proceedings is a third-party challenge

18   to a July 24, 2023, judgment approving the

19   accelerated safeguards plan, and there, the

20   parties are still submitting pleadings in that

21   action and pleadings need to be submitted by

22   October 17th.  So that one might still have a

23   little bit of time to go.

24        Second, the proceeding relating to the

25   lockup agreement which Petitioners have

1    explained in their application they're seeking

2    discovery in support of their challenge to the

3    lockup agreement, the parties had a hearing in

4    this proceeding on September 11th, so there may

5    still be some work that needs to be done in

6    that proceeding before the Court can issue a

7    decision.

8            And then there are four remaining

9    appeals, Your Honor.

10           THE COURT:  Okay.  Thank you very

11   much, Ms. Chung.  I appreciate that.

12           Mr. Lombardi, before I give Ms. Barday

13   the opportunity to respond and give her the

14   final word, another question for you, please.

15           MR. LOMBARDI:  Yes, Your Honor.

16           THE COURT:  Are you in agreement with

17   Ms. Barday that the parties would be taking any

18   dispute -- by "dispute" I mean a motion to

19   compel or a motion to quash -- regarding the

20   confidentiality privilege we've been discussing

21   back to France, or would that be heard in this

22   Court?

23           MR. LOMBARDI:  We don't agree, Your

24   Honor, but fundamentally, because I just don't

25   understand.  We agree to -- step back for a

1    moment.  We agree with the concept that, of

2    course, the French courts are the right court

3    to decide the conciliation privilege, and

4    they've repeatedly weighed in on the issue in

5    these very cases.  However, if the subpoenas

6    are issued under U.S. law; right?  And

7    Petitioner -- Respondents have to respond to

8    them and identify and log privileged

9    documents -- and again, we think it's going to

10   be everything -- and Petitioners have a dispute

11   with our privilege assertions, I at least am

12   not aware of any mechanism for you to pick up

13   the phone and call a judge in France and ask

14   for guidance on issues of French law.  I'm not

15   aware of the mechanism for the parties to take

16   the issues to a French court and seek an

17   advisory opinion.  I think you would be left

18   holding the bag having to rule on the issues of

19   French law and French privilege, and that's

20   going to be a very bad place for all of the

21   parties to be.  It's going to be a complicated

22   mess.

23           MS. CHUNG:  Your Honor, this is

24   Ms. Chung.  If I may, I just wanted to add that

25   while there may be some decisions where a U.S.

1    court has ordered documents that are subject to

2    a privilege to be logged so that the Court can

3    review them and adjudicate any disputes about

4    privilege, those are situations where the Court

5    has been asked to adjudicate issues of U.S.

6    privilege.

7          For example, I think in the *Chevron* case,

8    there was a situation where the Third Circuit

9    said, District Court, you can review whether

10   the documents would comply with the crime fraud

11   exception.  I have no doubt that a U.S. Court

12   could do that with regard to to a U.S.

13   privilege, but this Court certainly should not

14   be in a position where it has to decide issues

15   of French law privilege, and that's precisely

16   the position you would be the situation here if

17   you map this out all the way to the end.

18          THE COURT:  Thank you very much,

19   Ms. Chung.

20          Ms. Barday, let me ask you to start with

21   that point, please.  Look, I tend to agree.  I

22   have not researched this issue exhaustively,

23   but I tend to agree with Ms. Chung and

24   Mr. Lombardi that it sure seems that I would be

25   left or this court here would be left holding

1         the bag and be asked to determine the scope of

2         this privilege under French law.  Help me

3         understand why you think that's not the case.

4                   MS. BARDAY:  Sure, Your Honor.  So

5         first a point of clarification, and that is

6         that while respondents call this a privilege,

7         the documents submitted, including the

8         translation of the French decision, say that it

9         is not a privilege, so the privilege cases;

10        right?  I think properly belong in the blanket

11        of attorney-client are different.  We're not

12        asking you to decide issues of attorney-client

13        privilege, so I want to point the Court to

14        the -- let's see I've got page 8 of 43 of the

15        supplemental authority submission yesterday

16        refers to a duty of confidentiality, and the

17        court decision talks about the obligation of

18        confidentiality having been respected by all

19        defendants; right?  This idea that it is an

20        absolute privilege is incorrect, and it is

21        something that is disputed not just by the

22        documents submitted by the intervenor but also

23        by the declarations we've submitted in

24        connection with our application.

25                   I would also point Your Honor to

1    Respondent's brief in which they say this Court

2    should deny the application because to serve

3    the petition, to serve the subpoena, because

4    the French courts are better positioned to

5    determine what, if any, information could be

6    sought without violating French law.  I

7    understand Mr. Lombardi has now backed away

8    from that position, but I believe that's at

9    page 17 of their brief.

10          But it is equally true that in the battle

11   of the affidavits, the burden of proof is on

12   the respondents to prove that the French court

13   would not be receptive to any of this

14   information.  It's not clear to me why a French

15   court could not make that determination upon a

16   move to use the information; right?

17   Mr. Lombardi says I have no idea how they would

18   ever do this, but the documents obtained in

19   1782 would be requested to be moved into

20   evidence in France; right?  So that would be a

21   time when if -- sorry, Your Honor.

22          THE COURT:  I apologize, Ms. Barday.

23   I'm interrupting you, but I guess two points.

24   I'm not trying to trick you by calling it a

25   privilege.  Let's say it's confidential, merely

1    confidential.  I think the point is if

2    Mr. Lombardi is correct in his assumption that

3    everything that Petitioner has requested falls

4    within this confidentiality conciliation

5    confidential treatment, you wouldn't have any

6    documents to move into evidence in a French

7    court.  You'd have a privilege log, so you'd be

8    left with two options:  Taking that privilege

9    log to the French court and asking them to do

10   something with it -- and I don't know anything

11   about French courts, but I'm not sure -- I'm

12   not sure there's a procedural mechanism

13   there -- or coming back to this Court and

14   asking this Court to rule on whether that

15   privilege log -- whether those confidential

16   documents have been appropriately and properly

17   withheld under French law; right?

18            MS. BARDAY:  So generally, Your

19   Honor, yes, except that here's the caveats;

20   right?  So the time period for our subpoena

21   begins before the first installation, so it's

22   hard to imagine at that point how anything

23   could be privileged.  And our second -- the

24   second noon declaration sets forth at

25   paragraphs 42 to 46 the documents that couldn't

1       really conceivably be covered by the

2       conciliation privilege because they fall

3       outside the date range or they involve other

4       things; right?

5            For example, PJT's engagement letter;

6       right?  How would that be covered by

7       conciliation confidentiality; right?  It isn't.

8       It was specifically not submitted to the

9       conciliator.  Maybe they would say it was;

10      right?  But that's a document that doesn't

11      really concern this sort of settlement

12      negotiation type of confidentiality that

13      underlies this conciliation privilege.

14           But I think we are saying that we

15      understand what the French courts have said;

16      right?  And we are saying the documents used

17      directly in the conciliation; right?  We will

18      agree that's not what our requests seek.  But

19      what is interesting is that Respondents and

20      Orpea seem to be saying simply because; right?

21      This is -- if you served a regular subpoena,

22      you would never end up with a privilege log

23      because they say if some of the documents are

24      privileged, that means everything has got to be

25      covered; right?  Because actually, all of this

1    does relate to legal advice.  We were involved

2    in a legal proceeding, and that just doesn't

3    make sense.

4         I have a hard time understanding

5    Mr. Lombardi's position that there are no

6    documents that his clients have that relate to

7    anything other than directly to conciliation,

8    particularly given the time of their retention;

9    right?  And I think as to the things that

10    fairly fall within at least the time period for

11    the conciliation; right?  I think what you were

12    hearing us say is we believe that's a matter

13    for the French court and we do not intend to

14    raise that issue in front of Your Honor.

15         THE COURT:  Understood.  I think I

16    understood Mr. Lombardi to be saying, look, the

17    stuff that they want relates to the

18    conciliation because that's what they're

19    challenging, and the stuff that we have relates

20    to the conciliation, and of the stuff that we

21    have that relates to the conciliation, all of

22    that is privileged, not that there couldn't

23    conceivably be documents that wouldn't be, just

24    that the vast bulk of the documents that have

25    been requested, they would be claiming this

1    confidentiality over.

2         And I mean, I think Mr. Lombardi put it

3    as two documents in a napkin or something of

4    that sort.  There may be a handful of documents

5    that would fall outside, but I understand the

6    point that you're making -- I think I do -- but

7    I'm allegation a little bit stuck on this

8    notion --

9         Let me back up.  I understand the point

10   that you're making, that if this were a regular

11   subpoena and that it sought ten categories of

12   documents and nine of them are privileged that

13   you wouldn't just quash the whole darn thing.

14   You would fight over the one remaining or

15   however you might proceed.  But here, we're in

16   a different, you know, setup, I think, given

17   the statutory factors and the *Intel* factors,

18   where one of the things I have to look at is,

19   is there some sort of privilege or

20   confidentiality or clear ruling by the foreign

21   Court that should give the American Court some

22   pretty serious pause about whether this

23   subpoena should be issued?

24        Does that make sense?  Can you help me

25   work my way through that?

1              MS. BARDAY:  Sure.  Let me see what I
2    can do.  So, Your Honor, I guess a couple
3    things.
4          So one, I would take you back to our
5    instruction five, which assumes there will be
6    privileged or documents otherwise withheld --
7    withheld is the term -- whether under claim or
8    privilege or otherwise; right?  So that would
9    include the documents exchanged in connection
10   where the conciliation procedure; right?
11         As to burden and there's nothing outside
12   the scope and Mr. Lombardi believes maybe
13   there's a handful of documents, there are no
14   declarations before the Court on this issue,
15   and the Third Circuit has been clear that you
16   have to do something more than make legal
17   arguments about these items in order to prevail
18   on issues of burden because the burden is on
19   Respondents to establish that the burden is
20   undue.
21         And what we are telling Your Honor is
22   that we are not seeking these documents
23   improperly.  We are seeking things that fall
24   outside of the conciliation privilege; right?
25   We don't think it's an absolute that covers

1    everything in connection with the restructuring

2    proceedings, and that may be a point that we

3    disagree with Orpea, but the French courts have

4    not said that conciliation covers everything,

5    like if there's a conciliation, everything in

6    connection with restructuring is privileged.

7    There is no decision before this Court that

8    says that; right?

9         There are decisions that relate to

10   limited requests for documents very concretely

11   a part of the conciliation process.  Those

12   requests were not by our clients; right?  They

13   were by the Bank of India, maybe Banca and

14   White Box I believe is the last one we heard

15   about.  But we are saying we understand what

16   the Court has said.  We're not looking to make

17   an end run around the French court.  We're

18   looking for an entire other universe of

19   documents.

20        THE COURT:  Okay.  Well, then, let me

21   ask you this:  What's your plan as to any

22   documents that are logged on the privilege log

23   that Respondents claim are covered by the

24   conciliation confidentiality privilege?

25        MS. BARDAY:  So I guess my

1      hypothetical plan, and I'm mindful that it's

2      unwise to hypothesize before the ribber hits

3      the road; right?  If I got a privilege log that

4      included every single document, including

5      communications to third parties, including

6      things like an engagement letter; right?  We'd

7      have a meet-and-confer.  But is that something

8      that would end up before Your Honor?  I think

9      that answer is yes.

10     What I'm saying is something different.

11    We have in our second to noon declaration a

12    series of documents -- I think it's paragraphs

13    42 to 48 and no one has disputed that those are

14    outside of the conciliation privilege; right?

15    I'm not talking about close calls.  I'm talking

16    about something that happened weeks or months

17    before conciliation that may have nothing to do

18    with conciliation.

19     It is true.  Respondents take the

20    position that simply because there was a

21    conciliation, they have nothing to produce.  We

22    think that simply isn't supported by any of the

23    caselaw; right?

24     If we go and we say we want the

25    conciliation agreement, you know, they've

1    produced caselaw saying the conciliation

2    agreement should not be produced.  Then I think

3    we lose on that point, but I think the great

4    weight of the U.S. caselaw says unless the

5    French court has said I won't consider this

6    thing; right?  Or I won't consider any evidence

7    at all ever from America that the petition for

8    leave to serve the subpoena should be granted.

9              THE COURT:  Why isn't the answer here

10   to reissue a revised subpoena that doesn't seek

11   any documents that are, as you put it, close

12   calls and makes clear that you don't want

13   confidential documents and to seek a much

14   narrower class of documents that wouldn't

15   require a privilege log?

16             MS. BARDAY:  So I'm not sure, Your

17   Honor, that there's a world in which we could

18   ever craft requests that would be sure would

19   never implicate privilege; right?  Because

20   presumably these are all legal issues and so

21   they're going to hit on some kind of legal

22   privilege at some point.  Maybe not if you ask

23   specifically for this document or that

24   document, but whenever you're asking for

25   documents and communications, you're bound to

1    run up against confidentiality and privilege

2    obligations.  That's just the nature of

3    discovery.

4         I think, you know, the problem here is

5    that if we have to revise this, we have to

6    guess at what documents exist; right?  So as a

7    practical matter, we ask for all documents and

8    communications because we do not know what

9    specific communications exist.  We do not know

10   who the specific custodians are.  We don't know

11   the time period in which they have documents;

12   right?

13        We don't know very much about the

14   specifics of what these documents look like,

15   and that's why courts have held repeatedly that

16   issues as to scope, unless there's some sort of

17   quantified burden on an evidentiary basis put

18   forward, when we're looking at leave to serve

19   the subpoena, that issues of cope are best

20   determined through a meet-and-confer process

21   because that's when you figure out whether or

22   not you need to make modifications to what

23   you're doing, and that's the point of the

24   meet-and-confer process; right?  Subpoena

25   requests don't usually stand just as they are.

1      They're modified based on a meet-and-confer

2      process.

3              THE COURT:  Thank you, Ms. Barday,

4      and thank you to all the counsel on the line.

5      I'm going to take this matter under advisement.

6      In the meantime, I'm going to order you folks

7      to meet-and-confer and see if you can work this

8      out without Court intervention.  Both

9      Petitioner and Respondent have indicated, I

10     think, that they would be willing to

11     meet-and-confer, and it seems to me there is a

12     pretty easy path here to be taken, and I hope

13     the parties would take it.

14          With respect to the meet-and-confer, I'm

15     going to ask that when you do that, you let me

16     know one way or the other -- you can do either

17     by letter on the docket or you can reach out to

18     Mr. Kincaid -- and let him know that you have

19     completed the meet-and-confer process and

20     either all parties have reached an agreement

21     and the Court can simply issue an order off the

22     revised subpoena or something of that sort or

23     that the parties weren't able to work it out.

24          I'm also going to order that parties keep

25     me updated if any of the four remaining

```
1    collateral attacks in France are ruled upon.

2         With that, is there anything further from

3    counsel or that we should take up today?

4              MR. LOMBARDI:  Not from Respondents,

5    Your Honor thank.  You very much.

6              MS. CHUNG:  Not for Intervenor, Your

7    Honor.  Thank you.

8              MS. BARDAY:  Only, Your Honor, that

9    we've been given the issues of French law that

10   it may be worth -- and we offer for the other

11   parties' consideration that we all involve

12   French counsel in the discussions because it

13   may be it may make it more expeditious to

14   resolve issues of the confidentiality for

15   conciliation on that basis, but I think that's

16   an issue we can work out in a meet-and-confer.

17             THE COURT:  That certainly is a

18   reasonable suggestion, and I leave it to the

19   very able counsel on the line to work that out.

20        Thanks very much to all of you for your

21   hard work and your argument in this case.  I

22   certainly appreciate it.  It has been helpful

23   to the Court.

24        Take care and have a nice day.

25
```

1          **C E R T I F I C A T E**

2     STATE OF DELAWARE        )
                               ) ss:
3     COUNTY OF NEW CASTLE     )

4          I, Deanna L. Warner, a Certified

5     Shorthand Reporter, do hereby certify that as

6     such Certified Shorthand Reporter, I was

7     present at and reported in Stenotype shorthand

8     the above and foregoing proceedings in Case

9     Number 23-CV-670-RGA-LDH, *KYMA CAPITAL LIMITED,*

10    *et al. Vs. PJT PARTNERS INC., et al.*, heard on

11    September 20, 2023.

12         I further certify that a transcript of

13    my shorthand notes was typed and that the

14    foregoing transcript, consisting of 79

15    typewritten pages, is a true copy of said

16    **MOTION HEARING.**

17         **SIGNED, OFFICIALLY SEALED**, and **FILED**

18    with the Clerk of the District Court, NEW

19    CASTLE County, Delaware, this 27th day of

20    September, 2023.

21

22    _____

23    Deanna L. Warner, CSR, #1687
      Speedbudget Enterprises, LLC

24

25

# #

**#1687** [1] - 79:22

# 1

**100,000** [1] - 18:1
**11** [1] - 23:25
**11th** [1] - 63:4
**12** [1] - 25:8
**142** [2] - 38:13, 38:20
**145** [1] - 52:16
**15** [2] - 6:7, 24:16
**1690832** [1] - 57:14
**17** [1] - 67:9
**1782** [22] - 6:5, 6:9, 23:13, 25:16, 30:2, 36:11, 38:15, 40:25, 41:8, 42:3, 42:10, 44:16, 49:5, 57:20, 58:7, 58:10, 59:18, 59:20, 60:22, 61:9, 61:18, 67:19
**1782(a** [2] - 38:3, 39:21
**17th** [1] - 62:22
**18th** [1] - 5:24

# 2

**20** [2] - 41:17, 79:11
**2022** [2] - 57:14, 57:16
**2023** [5] - 1:13, 25:8, 62:18, 79:11, 79:20
**2088** [2] - 38:14, 38:20
**20th** [1] - 1:13
**22** [1] - 46:9
**23-CV-670-RGA** [1] - 1:5
**23-CV-670-RGA-LDH** [1] - 79:9
**24** [1] - 62:18
**241** [1] - 38:5
**252** [1] - 38:5
**26** [1] - 53:2
**260** [1] - 38:5
**27th** [1] - 79:19
**291** [1] - 41:17

# 3

**303** [1] - 41:17

# 4

**42** [2] - 68:25, 74:13

**43** [1] - 66:14
**46** [1] - 68:25
**48** [1] - 74:13

# 5

**5** [1] - 6:23
**5,000** [1] - 17:24
**500,000** [1] - 18:16
**524** [1] - 38:4

# 6

**61115** [1] - 54:9

# 7

**70** [1] - 22:5
**79** [1] - 79:14
**793** [1] - 41:16

# 8

**8** [1] - 66:14

# 9

**9-0** [1] - 38:14
**975** [1] - 53:3

# A

**ability** [1] - 28:22
**able** [4] - 5:10, 34:19, 77:23, 78:19
**absence** [1] - 15:13
**absolute** [7] - 31:20, 32:25, 37:15, 42:9, 42:14, 66:20, 72:25
**absolutely** [4] - 3:16, 12:20, 26:11, 60:16
**accelerated** [2] - 7:12, 62:19
**accept** [3] - 25:5, 25:6
**acceptable** [1] - 51:4
**access** [5] - 25:25, 27:8, 27:10, 36:7, 58:6
**accounting** [1] - 55:3
**achieved** [1] - 27:18
**acknowledge** [1] - 18:9
**acknowledging** [1] - 16:9
**acknowledgment** [1] - 14:4

**action** [3] - 28:9, 56:8, 62:21
**actions** [2] - 45:4, 62:9
**add** [1] - 64:24
**additionally** [1] - 59:25
**address** [3] - 21:23, 38:8, 62:7
**addressed** [1] - 50:1
**addresses** [1] - 6:22
**adjudicate** [3] - 22:7, 65:3, 65:5
**admissible** [9] - 5:14, 9:19, 19:1, 24:9, 24:14, 29:12, 30:2, 30:9, 30:25
**admit** [3] - 19:4, 44:3, 44:14
**admitted** [3] - 3:14, 4:5, 32:10
**ado** [1] - 4:20
**advice** [3] - 28:6, 28:7, 70:1
**advisement** [1] - 77:5
**advisor** [2] - 10:19, 27:23
**advisor's** [1] - 28:6
**advisors** [1] - 28:5
**advisory** [1] - 64:17
**advocate** [1] - 40:21
**affect** [1] - 62:12
**affidavit** [3] - 33:16, 42:2, 54:17
**affidavits** [2] - 29:24, 67:11
**affirmatively** [3] - 41:21, 41:24, 47:17
**afternoon** [9] - 3:5, 3:17, 3:21, 4:10, 4:13, 4:16, 4:18, 35:12, 50:13
**afterwards** [1] - 7:9
**AG** [1] - 57:14
**agree** [10] - 12:9, 14:6, 19:25, 46:3, 63:23, 63:25, 64:1, 65:21, 65:23, 69:18
**agreement** [18] - 13:19, 13:21, 14:12, 15:8, 19:23, 30:24, 33:21, 53:17, 54:15, 54:25, 55:7, 55:10, 62:25, 63:3, 63:16, 74:25, 75:2, 77:20
**agreements** [2] - 14:14, 54:2
**ahead** [2] - 4:20, 35:10
**aims** [1] - 37:21
**air** [1] - 51:20

**al** [4] - 1:3, 1:7, 79:10
**Aleena** [1] - 4:4
**ALEENA** [1] - 2:8
**allegation** [1] - 71:7
**allegations** [1] - 28:13
**allies** [1] - 36:5
**allow** [2] - 9:2, 61:5
**allowed** [1] - 44:9
**allowing** [1] - 45:3
**allows** [1] - 52:6
**altogether** [1] - 30:10
**ALYSHA** [1] - 1:20
**Alysha** [1] - 3:12
**America** [1] - 75:7
**American** [6] - 11:9, 23:11, 24:1, 26:8, 27:15, 71:21
**amount** [3] - 45:7, 48:16, 56:17
**anchorage** [5] - 3:23, 4:6, 8:17, 10:17, 13:8
**Anchorage** [6] - 26:20, 27:3, 50:17, 50:18, 59:7, 61:23
**AND** [1] - 1:2
**andrew** [1] - 3:22
**ANDREW** [1] - 2:3
**animating** [1] - 38:15
**answer** [10] - 19:10, 19:16, 22:21, 34:16, 42:6, 49:21, 50:7, 59:10, 74:9, 75:9
**answering** [1] - 36:20
**answers** [1] - 27:22
**anyway** [1] - 29:17
**apologize** [3] - 13:11, 21:3, 67:22
**apparent** [1] - 14:11
**appeal** [14] - 5:22, 5:25, 6:3, 21:8, 21:11, 21:16, 21:18, 21:24, 22:5, 23:12, 23:17, 23:19, 25:9, 55:18
**appealed** [1] - 55:16
**appeals** [3] - 23:4, 50:2, 63:9
**appear** [1] - 13:14
**APPEARANCES** [1] - 1:15
**Appearances** [1] - 2:1
**appeared** [1] - 57:24
**appellate** [5] - 22:2, 22:12, 22:15, 23:20
**applicable** [1] - 47:12
**applicant** [3] - 57:19, 58:4, 58:9
**applicants** [2] - 58:17, 60:1

**application** [23] - 4:22, 37:3, 39:4, 39:7, 39:12, 42:11, 42:17, 44:7, 46:15, 47:14, 49:5, 49:11, 49:16, 49:18, 53:24, 55:6, 57:13, 58:1, 59:18, 62:2, 63:1, 66:24, 67:2
**applications** [1] - 23:13
**applied** [1] - 40:12
**applies** [2] - 15:16, 35:17
**apply** [3] - 33:8, 43:11, 43:15
**appointed** [2] - 53:8, 55:1
**appointment** [1] - 55:11
**appreciate** [6] - 9:23, 18:7, 49:22, 62:7, 63:11, 78:22
**appropriate** [2] - 47:25, 49:7
**appropriately** [1] - 68:16
**approval** [6] - 15:21, 36:2, 53:25, 54:24, 55:6, 55:9
**approved** [1] - 35:25
**approving** [1] - 62:18
**area** [1] - 5:6
**arguably** [2] - 8:2, 12:25, 31:9
**argue** [3] - 16:19, 29:10, 42:21
**arguing** [2] - 3:14, 29:8
**argument** [10] - 11:17, 14:8, 16:20, 18:8, 29:16, 31:14, 31:15, 39:24, 45:10, 78:21
**arguments** [4] - 12:2, 37:4, 61:24, 72:17
**arose** [1] - 54:3
**array** [1] - 53:1
**ARSHT** [1] - 2:3
**article** [2] - 52:16, 54:9
**articulated** [1] - 37:18
**ASHBY** [1] - 2:10
**Ashby** [1] - 4:11
**aside** [3] - 16:24, 21:11, 22:12
**assert** [2] - 13:22, 20:11
**assertions** [1] - 64:11
**asset** [1] - 54:3
**assist** [1] - 38:16

**assistance** [6] - 37:22, 37:25, 38:19, 44:16, 60:24, 61:1
**assume** [1] - 31:15
**assumes** [1] - 72:5
**assuming** [1] - 45:6
**assumption** [1] - 68:2
**asteroid** [1] - 59:16
**attack** [1] - 21:5
**attacks** [6] - 12:22, 13:13, 22:14, 35:22, 49:25, 78:1
**attempt** [3] - 39:13, 44:7, 58:2
**attention** [1] - 8:23
**attorney** [4] - 7:2, 31:2, 66:11, 66:12
**attorney-client** [4] - 7:2, 31:2, 66:11, 66:12
**audio** [2] - 7:13, 7:18
**authoritative** [2] - 42:22, 43:7
**authority** [6] - 5:18, 24:6, 39:23, 40:3, 53:11, 66:15
**authorization** [1] - 53:16
**authorize** [1] - 33:2
**automatically** [1] - 11:14
**automotive** [5] - 36:19, 37:19, 38:6, 49:3, 49:13
**available** [3] - 15:15, 45:13, 47:16
**availed** [1] - 45:12
**avoid** [1] - 29:18
**award** [1] - 56:19
**awarded** [2] - 23:24, 24:3
**aware** [2] - 64:12, 64:15

### B

**backed** [1] - 67:7
**bad** [4] - 60:2, 60:8, 60:20, 64:20
**bag** [2] - 64:18, 66:1
**ballpark** [1] - 22:13
**Banca** [3] - 54:13, 54:14, 73:13
**bank** [3] - 8:21, 12:2, 73:13
**bankruptcy** [4] - 11:9, 27:15, 35:23, 40:11
**BARDAY** [39] - 1:19, 4:25, 7:23, 9:25,

10:6, 10:13, 11:4, 11:23, 12:17, 13:4, 13:10, 13:16, 14:15, 17:2, 18:21, 19:15, 21:8, 21:14, 21:19, 21:25, 22:19, 23:9, 24:10, 25:3, 25:23, 26:19, 27:2, 27:19, 29:22, 32:14, 33:13, 34:15, 35:3, 66:4, 68:18, 72:1, 73:25, 75:16, 78:8
**Barday** [12] - 3:10, 3:13, 4:24, 7:19, 9:24, 48:12, 49:24, 63:12, 63:17, 65:20, 67:22, 77:3
**based** [2] - 6:23, 77:1
**basis** [12] - 7:15, 7:21, 35:1, 39:3, 51:15, 54:6, 54:8, 55:24, 56:19, 57:22, 76:17, 78:15
**battle** [7] - 29:24, 33:16, 42:1, 42:2, 43:21, 51:19, 67:10
**bear** [1] - 24:2
**bearing** [2] - 27:11, 46:1
**become** [1] - 15:15
**began** [1] - 16:2
**begins** [1] - 68:21
**behalf** [8] - 3:2, 3:7, 3:14, 3:18, 4:12, 4:15, 50:12, 50:14
**belief** [1] - 21:16
**believes** [1] - 72:12
**belong** [2] - 51:9, 66:10
**benefit** [1] - 30:8
**best** [6] - 8:4, 29:22, 40:7, 50:7, 62:11, 76:19
**better** [3] - 5:7, 22:17, 67:4
**between** [7] - 14:9, 18:10, 22:14, 29:13, 39:20, 41:18, 46:20
**beyond** [1] - 9:13
**bigger** [1] - 48:23
**bill** [1] - 20:14
**biomed** [1] - 26:10
**Biomed** [2] - 17:9, 17:10
**bit** [3] - 30:3, 62:23, 71:7
**blanket** [1] - 66:10
**bodies** [2] - 38:12, 38:17
**bolster** [1] - 39:24

**bones** [1] - 18:4
**bound** [1] - 75:25
**box** [1] - 73:14
**breadth** [1] - 16:7
**Brianna** [1] - 3:10
**BRIANNA** [1] - 1:19
**brief** [9] - 6:7, 8:6, 17:10, 24:16, 35:7, 60:10, 60:11, 67:1, 67:9
**briefing** [3] - 14:4, 52:25, 60:15
**briefly** [5] - 5:1, 36:12, 36:17, 37:1, 52:15
**briefs** [3] - 9:22, 14:19, 15:6
**bringing** [1] - 57:17
**brings** [1] - 33:9
**broad** [6] - 32:25, 33:23, 34:2, 46:18, 52:19, 53:1
**broadly** [1] - 45:10
**brought** [1] - 52:17
**brown** [1] - 3:6
**BROWN** [2] - 1:16, 3:5
**bulk** [1] - 70:24
**bunch** [4] - 28:2, 28:18, 30:12, 33:25
**burden** [15] - 17:17, 18:5, 18:11, 18:19, 42:22, 47:9, 47:11, 47:23, 48:11, 67:11, 72:11, 72:18, 72:19, 76:17
**burdensome** [2] - 17:19, 18:3
**business** [1] - 55:4
**Buter** [1] - 41:16
**BY** [3] - 1:16, 2:10, 2:13

### C

**cannot** [3] - 20:5, 20:8, 37:13
**capacity** [1] - 56:15
**CAPITAL** [2] - 1:3, 79:9
**capital** [1] - 3:23
**care** [1] - 78:24
**carrying** [1] - 53:6
**case** [22] - 4:13, 15:19, 17:10, 17:11, 26:10, 26:15, 29:6, 29:7, 29:25, 39:15, 41:4, 43:15, 49:15, 52:25, 55:18, 57:13, 59:3, 59:15, 59:16, 65:7, 66:3, 78:21

**CASE** [1] - 2:12
**Case** [2] - 1:5, 79:8
**caselaw** [7] - 33:14, 33:18, 57:9, 60:18, 74:23, 75:1, 75:4
**cases** [19] - 6:3, 6:8, 12:14, 12:15, 23:15, 24:19, 25:12, 30:22, 33:16, 39:1, 39:2, 40:12, 41:7, 41:20, 57:11, 59:24, 59:25, 64:5, 66:9
**CASTLE** [2] - 79:3, 79:19
**categories** [3] - 45:25, 46:13, 71:11
**category** [3] - 41:22, 48:2, 48:20
**CATHERINE** [1] - 2:10
**Catherine** [1] - 4:11
**cautioned** [1] - 6:19
**caveats** [1] - 68:19
**certain** [3] - 8:21, 36:2, 56:15
**certainly** [11] - 7:8, 18:7, 20:17, 21:19, 23:13, 26:15, 41:7, 44:10, 65:13, 78:17, 78:22
**Certified** [2] - 79:4, 79:6
**certify** [2] - 79:5, 79:12
**challenge** [2] - 62:17, 63:2
**challenging** [2] - 36:3, 70:19
**change** [1] - 55:19
**changed** [1] - 28:7
**Chevron** [3] - 42:25, 43:1, 65:7
**chief** [1] - 57:15
**Chung** [8] - 4:14, 4:15, 50:11, 62:6, 63:11, 64:24, 65:19, 65:23
**CHUNG** [5] - 2:13, 50:13, 62:14, 64:23, 78:6
**circuit** [6] - 17:11, 26:1, 41:15, 43:9, 43:11, 72:15
**Circuit** [2] - 43:8, 65:8
**circuit's** [2] - 42:25, 43:4
**circumstances** [1] - 55:20
**circumvent** [3] - 32:4, 39:13, 58:14
**cite** [2] - 42:24, 59:3
**cited** [3] - 6:6, 17:10,

24:19
**claim** [5] - 6:23, 28:17, 49:3, 72:7, 73:23
**claiming** [1] - 70:25
**claims** [4] - 25:17, 52:21, 53:9, 57:18
**clarification** [1] - 66:5
**clarified** [1] - 59:1
**clarify** [1] - 5:20
**clarity** [1] - 22:1
**class** [1] - 75:14
**classic** [4] - 29:19, 42:1, 51:7, 51:19
**clause** [1] - 53:20
**clear** [17] - 10:15, 22:8, 26:1, 30:20, 31:16, 37:12, 37:16, 37:17, 44:8, 45:21, 47:14, 58:19, 59:19, 67:14, 71:20, 72:15, 75:12
**clearer** [1] - 39:15
**clearly** [1] - 17:11
**Clerk** [1] - 79:18
**client** [4] - 7:2, 31:2, 66:11, 66:12
**clients** [2] - 70:6, 73:12
**climate** [1] - 52:8
**cloak** [1] - 46:24
**close** [2] - 74:15, 75:11
**club** [1] - 54:22
**Co** [3] - 10:18, 10:20, 28:15
**code** [3] - 40:11, 54:10, 55:25
**codified** [1] - 55:24
**COLIN** [1] - 2:7
**Colin** [1] - 4:3
**collateral** [7] - 12:22, 13:13, 21:5, 22:14, 35:22, 49:25, 78:1
**colleague** [2] - 3:9, 3:25
**colleagues** [4] - 3:11, 4:1, 4:13, 22:22
**coming** [8] - 5:19, 26:8, 29:17, 34:25, 45:16, 58:17, 60:17, 68:13
**comity** [1] - 38:16
**commercial** [2] - 53:23, 54:10
**common** [2] - 59:3, 59:16
**communicated** [1] - 55:5
**communications** [12] - 15:5, 20:7, 20:13,

20:14, 28:4, 28:10, 28:19, 30:16, 74:5, 75:25, 76:8, 76:9
**companies** [2] - 5:11, 61:13
**company** [2] - 56:13, 57:21
**compel** [6] - 9:10, 11:8, 34:13, 34:25, 59:9, 63:19
**compelled** [1] - 8:8
**complete** [1] - 52:8
**completed** [1] - 77:19
**complicated** [1] - 64:21
**comply** [1] - 65:10
**conceivably** [2] - 69:1, 70:23
**conceived** [1] - 7:8
**concept** [1] - 64:1
**concern** [4] - 19:14, 29:6, 33:10, 69:11
**concerning** [1] - 20:7
**concerns** [3] - 16:25, 17:17, 17:20
**conciliation** [86] - 6:11, 6:15, 7:3, 7:7, 7:11, 7:15, 8:3, 8:10, 9:8, 10:14, 10:16, 10:19, 12:10, 13:19, 13:21, 14:1, 14:7, 14:10, 14:22, 18:23, 19:19, 19:22, 20:3, 20:8, 20:23, 24:7, 27:13, 30:12, 30:14, 30:17, 30:24, 31:11, 31:15, 31:23, 32:23, 34:2, 34:11, 37:6, 40:5, 42:23, 45:9, 46:17, 46:22, 51:16, 52:3, 53:17, 53:25, 54:4, 54:9, 54:15, 54:25, 55:7, 55:9, 55:22, 55:23, 55:25, 56:11, 56:16, 60:19, 61:8, 64:3, 68:4, 69:2, 69:7, 69:13, 69:17, 70:7, 70:11, 70:18, 70:20, 70:21, 72:10, 72:24, 73:4, 73:5, 73:11, 73:24, 74:14, 74:17, 74:18, 74:21, 74:25, 75:1, 78:15
**conciliations** [1] - 50:24
**conciliator** [4] - 15:6, 52:5, 52:23, 69:9
**conclude** [1] - 9:3
**conclusory** [1] - 18:4

**concretely** [1] - 73:10
**conducting** [1] - 47:23
**confer** [13] - 5:8, 8:5, 18:13, 31:3, 74:7, 76:20, 76:24, 77:1, 77:7, 77:11, 77:14, 77:19, 78:16
**confidential** [10] - 13:23, 14:6, 15:11, 20:3, 20:11, 67:25, 68:1, 68:5, 68:15, 75:13
**confidentiality** [52] - 6:11, 6:16, 7:4, 7:15, 8:4, 8:10, 9:4, 9:7, 9:9, 12:10, 13:1, 14:12, 15:12, 15:16, 15:23, 16:12, 16:14, 16:25, 17:8, 17:22, 18:23, 19:13, 19:20, 20:4, 20:16, 24:13, 31:25, 33:23, 34:3, 39:22, 39:25, 41:6, 46:2, 52:2, 52:9, 53:20, 55:25, 56:6, 59:13, 61:7, 61:10, 63:20, 66:16, 66:18, 68:4, 69:7, 69:12, 71:1, 71:20, 73:24, 76:1, 78:14
**confirm** [2] - 21:15, 21:20
**connection** [8] - 11:25, 14:20, 15:7, 25:9, 66:24, 72:9, 73:1, 73:6
**Connolly** [2] - 57:15, 57:21
**consider** [3] - 27:12, 75:5, 75:6
**consideration** [2] - 49:6, 78:11
**considering** [2] - 19:3, 57:17
**consistent** [1] - 20:3
**consisting** [1] - 79:14
**consolidated** [1] - 50:25
**construed** [2] - 10:23, 11:2
**consult** [1] - 53:17
**contact** [2] - 27:24, 27:25
**contain** [1] - 43:1
**contained** [1] - 15:21
**contemplate** [1] - 25:15
**contemplated** [2] - 39:21, 39:22
**contends** [1] - 34:17

**context** [1] - 14:16
**continued** [1] - 2:1
**contours** [1] - 31:19
**contracts** [1] - 54:2
**contradict** [1] - 52:12
**contravene** [1] - 61:3
**contravened** [1] - 54:8
**cope** [1] - 76:19
**copies** [1] - 54:14
**copy** [2] - 19:17, 79:15
**core** [1] - 49:1
**correct** [6] - 4:24, 33:22, 35:4, 43:13, 45:7, 68:2
**correctly** [1] - 35:7
**correspondence** [1] - 54:1
**costs** [1] - 24:2
**coterminous** [1] - 20:10
**counsel** [5] - 1:21, 77:4, 78:3, 78:12, 78:19
**Counsel** [2] - 2:9, 2:14
**count** [1] - 38:2
**counting** [1] - 50:2
**countries** [1] - 37:24
**COUNTY** [1] - 79:3
**County** [1] - 79:19
**couple** [4] - 27:20, 36:24, 57:11, 72:2
**course** [6] - 35:15, 37:4, 37:12, 38:21, 47:8, 64:2
**court** [74] - 9:4, 9:10, 10:21, 11:7, 11:21, 15:18, 15:19, 15:21, 17:12, 19:2, 19:4, 19:24, 22:16, 23:15, 24:6, 25:22, 26:9, 26:18, 30:21, 30:23, 31:17, 33:18, 33:24, 34:19, 35:8, 35:24, 36:1, 36:2, 38:14, 38:22, 39:10, 41:9, 43:18, 43:22, 43:24, 44:2, 44:3, 44:13, 44:14, 45:14, 45:16, 50:1, 52:11, 53:8, 53:23, 56:25, 58:9, 58:11, 59:4, 62:10, 64:2, 64:16, 65:1, 65:9, 65:11, 65:13, 65:25, 66:17, 67:1, 67:12, 67:15, 68:7, 68:9, 68:13, 68:14, 70:13, 71:21, 73:7, 73:17, 75:5, 77:8
**Court's** [5] - 8:22, 8:23, 54:24, 58:3, 62:12
**court's** [4] - 8:25, 44:19, 49:5, 54:24
**court-appointed** [1] - 53:8
**court-supervised** [1] - 35:24
**Courts** [5] - 6:19, 21:23, 25:5, 25:13, 41:8
**courts** [30] - 5:19, 6:8, 32:8, 36:4, 36:6, 37:25, 38:16, 38:24, 38:25, 39:23, 43:19, 43:24, 43:25, 45:2, 45:22, 47:16, 47:17, 52:12, 56:25, 57:5, 58:21, 60:25, 61:1, 62:3, 64:2, 67:4, 68:11, 69:15, 73:3, 76:15

22:15, 23:14, 25:20, 29:18, 30:9, 31:21, 33:10, 34:23, 35:19, 36:18, 37:18, 37:20, 38:1, 38:7, 38:10, 38:13, 38:20, 39:6, 41:18, 42:12, 42:14, 43:9, 49:4, 49:9, 49:15, 51:23, 54:6, 55:5, 55:8, 55:10, 55:24, 56:3, 56:12, 56:19, 59:8, 59:11, 59:17, 59:18, 60:17, 62:1, 63:6, 63:22, 65:2, 65:4, 66:13, 72:14, 73:16, 77:21, 78:23, 79:18
**COURT** [58] - 1:1, 3:1, 3:16, 4:7, 4:17, 7:19, 9:23, 10:1, 10:9, 10:22, 11:16, 12:13, 12:20, 13:9, 13:11, 14:3, 16:1, 18:7, 19:9, 21:2, 21:11, 21:17, 21:22, 22:11, 23:1, 24:5, 24:22, 25:18, 26:11, 26:24, 27:9, 29:2, 32:12, 32:17, 34:5, 34:24, 35:9, 39:16, 40:22, 41:23, 44:10, 45:6, 45:24, 46:17, 48:11, 48:22, 49:22, 50:9, 62:6, 63:10, 63:16, 65:18, 67:22, 70:15, 73:20, 75:9, 77:3, 78:17
**Court's** [5] - 8:22, 8:23, 54:24, 58:3, 62:12
**count** [1] - 38:2
**Court** [56] - 5:23, 12:6, 12:10, 12:12, 16:17,

**courts'** [1] - 24:17
**cover** [7] - 5:5, 7:8, 8:2, 31:9, 34:21, 36:12, 57:12
**covered** [16] - 9:8, 15:3, 16:11, 16:12, 17:7, 17:21, 19:7, 30:13, 30:17, 47:4, 48:5, 53:19, 69:1, 69:6, 69:25, 73:23
**covers** [5] - 7:4, 20:16, 33:1, 72:25, 73:4
**craft** [1] - 75:18
**crafters** [1] - 40:10
**create** [3] - 38:13, 45:3, 61:17
**creditor** [1] - 56:8
**creditors** [14] - 11:10, 13:13, 28:18, 28:20, 35:25, 36:3, 52:4, 52:7, 52:18, 53:1, 53:4, 53:15, 54:13, 54:22
**crime** [1] - 65:10
**critical** [2] - 41:15, 43:16
**criticized** [1] - 45:11
**crock** [1] - 57:14
**CSR** [1] - 79:22
**custodians** [1] - 76:10
**cut** [1] - 7:20
**cutting** [1] - 17:15

**D**

**darn** [1] - 71:13
**date** [3] - 7:5, 36:5, 69:3
**days** [1] - 22:5
**deadline** [1] - 22:2
**deal** [2] - 28:11, 49:11
**Deanna** [1] - 79:4, 79:22
**debtor** [1] - 52:4
**debtors** [1] - 52:7
**decide** [5] - 34:19, 43:12, 64:3, 65:14, 66:12
**decided** [3] - 51:24, 55:24, 57:1
**deciding** [1] - 51:24
**decision** [31] - 15:18, 15:21, 22:10, 22:18, 24:11, 36:5, 37:19, 42:25, 43:4, 43:6, 43:8, 52:24, 53:4, 54:11, 54:12, 55:13, 55:15, 55:17, 56:2, 56:5, 57:15, 58:1,

61:4, 61:5, 61:9, 62:12, 62:13, 63:7, 66:8, 66:17, 73:7
**decisions** [16] - 5:19, 21:9, 22:3, 24:15, 31:17, 51:12, 51:17, 52:12, 52:14, 56:20, 56:21, 57:8, 61:2, 62:3, 64:25, 73:9
**declarant** [2] - 40:18, 40:20
**declaration** [6] - 12:6, 40:4, 40:10, 46:9, 68:24, 74:11
**declarations** [7] - 6:17, 12:8, 21:1, 29:25, 31:10, 66:23, 72:14
**declined** [1] - 55:10
**deem** [1] - 53:6
**defendant** [3] - 57:25, 58:5, 58:13
**defendants** [1] - 66:19
**Defendants** [2] - 1:8, 2:9
**defer** [1] - 50:4
**deferring** [1] - 49:6
**defined** [1] - 26:25
**definitional** [1] - 29:9
**definitive** [1] - 56:5
**Delaware** [11] - 3:3, 3:19, 5:12, 9:18, 57:20, 58:17, 58:19, 61:13, 61:14, 61:17, 79:19
**DELAWARE** [2] - 1:2, 79:2
**Delaware-incorporated** [1] - 57:20
**denial** [1] - 17:12
**denied** [11] - 8:21, 31:7, 36:6, 37:3, 39:1, 42:17, 49:18, 54:6, 57:21, 59:18, 62:4
**deny** [3] - 7:16, 7:21, 67:2
**determination** [1] - 67:15
**determine** [4] - 53:12, 53:13, 66:1, 67:5
**determined** [1] - 76:20
**determining** [2] - 5:10, 9:14
**DI** [2] - 46:9, 53:2
**difference** [4] - 11:19, 18:9, 18:10, 39:20
**different** [9] - 19:10, 25:24, 26:14, 27:20,

36:9, 40:17, 66:11, 71:16, 74:10
**dig** [1] - 57:2
**direct** [1] - 6:3
**directly** [3] - 38:9, 69:17, 70:7
**disagree** [4] - 13:16, 25:3, 35:1, 73:3
**disclose** [2] - 11:14, 53:18
**disclosed** [5] - 9:6, 15:14, 15:19, 19:23, 48:7
**disclosure** [4] - 12:7, 15:13, 54:1, 55:12
**disclosures** [1] - 9:2
**disconnect** [1] - 35:16
**discoverable** [1] - 24:8
**discovery** [65] - 6:9, 8:21, 11:8, 11:14, 11:22, 11:24, 13:4, 17:14, 23:5, 25:1, 25:16, 25:20, 25:23, 26:4, 26:17, 26:23, 28:23, 29:1, 30:10, 37:12, 38:23, 38:24, 38:25, 39:11, 41:9, 41:11, 41:18, 41:20, 41:24, 42:7, 42:24, 43:19, 43:23, 45:3, 45:8, 45:12, 45:23, 47:15, 49:8, 49:16, 51:5, 51:12, 51:13, 51:25, 52:19, 54:19, 56:4, 56:19, 56:22, 57:2, 57:20, 58:3, 58:11, 58:14, 58:18, 59:5, 59:21, 60:11, 61:5, 61:9, 61:18, 63:2, 76:3
**discretionary** [1] - 42:12
**discussed** [2] - 52:24, 54:16
**discussing** [2] - 46:3, 63:20
**discussion** [1] - 58:23
**discussions** [1] - 78:12
**dismissed** [1] - 21:13
**disposal** [1] - 54:3
**dispositive** [3] - 37:7, 37:9, 39:9
**dispute** [12] - 11:16, 32:20, 32:23, 32:24, 33:6, 33:19, 43:14, 46:20, 58:4, 63:18, 64:10
**disputed** [2] - 66:21,

74:13
**disputes** [1] - 65:3
**distinction** [7] - 14:9, 41:13, 41:15, 41:16, 41:18, 43:17, 51:2
**District** [2] - 43:9, 79:18
**district** [4] - 17:12, 26:5, 49:4, 65:9
**DISTRICT** [2] - 1:1, 1:2
**docket** [1] - 77:17
**document** [8] - 5:17, 19:5, 30:8, 53:7, 69:10, 74:4, 75:23, 75:24
**documented** [1] - 48:21
**documents** [112] - 5:13, 6:22, 6:25, 7:2, 7:4, 7:6, 7:14, 8:1, 8:3, 8:6, 8:9, 8:13, 8:14, 8:15, 8:17, 8:24, 9:11, 9:18, 10:11, 12:5, 12:7, 12:11, 13:6, 13:18, 13:25, 14:2, 15:25, 17:6, 17:21, 17:24, 17:25, 18:1, 18:15, 18:22, 18:25, 19:3, 19:6, 20:7, 20:10, 20:18, 20:20, 24:7, 24:18, 24:20, 26:3, 26:8, 27:3, 30:1, 30:12, 30:13, 31:8, 31:16, 31:22, 32:1, 32:5, 32:7, 33:25, 34:4, 34:9, 34:13, 34:17, 45:25, 46:4, 48:2, 48:16, 50:20, 50:21, 51:8, 51:9, 53:5, 53:19, 53:22, 55:21, 57:24, 58:20, 59:5, 59:10, 64:9, 65:1, 65:10, 66:7, 66:22, 67:18, 68:6, 68:16, 68:25, 69:16, 69:23, 70:6, 70:23, 70:24, 71:3, 71:4, 71:12, 72:6, 72:9, 72:13, 72:22, 73:10, 73:19, 73:22, 74:12, 75:11, 75:13, 75:14, 75:25, 76:6, 76:7, 76:11, 76:14
**done** [4] - 22:7, 24:24, 44:9, 63:5
**door** [1] - 56:4
**doubt** [3] - 42:16, 47:19, 65:11
**down** [4] - 17:14,

17:16, 32:11, 49:10
**draw** [1] - 51:1
**drawing** [1] - 14:8
**drew** [2] - 41:16, 41:18
**during** [1] - 14:25
**duties** [1] - 53:6
**duty** [1] - 66:16

**E**

**e-mail** [2] - 14:25, 25:8
**e-mailed** [1] - 20:1
**e-mails** [1] - 27:6
**easy** [1] - 77:12
**effect** [1] - 31:24
**efficient** [1] - 37:22
**efforts** [1] - 10:11
**eight** [2] - 12:22, 21:12
**either** [8] - 18:17, 24:8, 25:19, 34:6, 42:17, 43:7, 77:16, 77:20
**elsewhere** [1] - 61:21
**empirical** [1] - 17:18
**employ** [1] - 58:11
**empowered** [1] - 27:24
**enables** [1] - 52:4
**encourage** [1] - 60:25
**encourages** [1] - 38:19
**encouraging** [1] - 37:24
**end** [15] - 16:16, 18:10, 18:18, 22:25, 29:6, 29:9, 29:19, 33:10, 44:7, 47:21, 51:7, 65:17, 69:22, 73:17, 74:8
**ENERIO** [1] - 1:16
**Enerio** [1] - 3:6
**engagement** [2] - 69:5, 74:6
**ensuring** [1] - 40:24
**Enterprises** [1] - 79:23
**entire** [2] - 45:4, 73:18
**entirely** [1] - 51:4
**entirety** [4] - 35:21, 46:9, 46:11, 49:19
**entities** [7] - 11:19, 26:5, 26:25, 51:3, 52:23, 58:18, 61:18
**entitled** [3] - 12:4, 19:25, 32:8
**entity** [4] - 26:22, 27:25, 57:17, 57:19
**envisioning** [1] - 34:5

**equally** [1] - 67:10
**erroneous** [1] - 17:13
**error** [2] - 49:1, 49:4
**errors** [3] - 36:24, 42:5, 42:20
**especially** [2] - 29:7, 60:9
**ESQ** [14] - 1:16, 1:19, 1:19, 1:20, 1:20, 2:3, 2:4, 2:6, 2:7, 2:7, 2:8, 2:10, 2:13, 2:13
**essentially** [5] - 11:17, 11:20, 16:20, 24:24, 29:8
**establish** [1] - 72:19
**et** [4] - 1:3, 1:7, 79:10
**event** [1] - 55:19
**events** [2] - 22:24, 56:15
**eventual** [1] - 27:14
**evidence** [14] - 6:5, 17:18, 23:12, 23:16, 23:18, 25:5, 25:6, 44:4, 44:14, 60:20, 67:20, 68:6, 75:6
**evidentiary** [1] - 76:17
**exactly** [1] - 41:12
**example** [11] - 13:18, 14:24, 19:21, 20:6, 28:12, 30:24, 34:7, 34:8, 37:24, 65:7, 69:5
**except** [1] - 68:19
**exception** [1] - 65:11
**exceptions** [1] - 12:9
**exchanged** [1] - 72:9
**excluded** [1] - 24:21
**exhaust** [1] - 29:14
**exhaustion** [2] - 26:2, 45:17
**exhaustively** [1] - 65:22
**exist** [3] - 60:23, 76:6, 76:9
**exists** [2] - 48:10, 60:23
**expectation** [1] - 56:18
**expeditious** [1] - 78:13
**expert** [15] - 40:4, 40:13, 40:15, 40:21, 42:1, 43:21, 43:23, 53:8, 53:10, 53:16, 53:19, 55:1, 55:2, 55:11, 55:13
**expert's** [2] - 46:8, 46:10
**experts** [2] - 43:21, 51:19

**explain** [1] - 62:1
**explained** [2] - 38:10, 63:1
**expressly** [1] - 38:3
**extent** [1] - 20:9

## F

**F.3d** [1] - 41:17
**face** [1] - 37:16
**faced** [1] - 42:1
**fact** [10] - 7:13, 8:13, 9:5, 9:9, 19:20, 20:24, 23:12, 26:16, 45:19, 59:9
**factor** [14] - 10:2, 19:8, 39:9, 39:12, 43:16, 43:17, 47:11, 57:10, 57:22, 58:23, 58:25, 60:3, 60:4
**factors** [13] - 16:5, 16:13, 16:14, 37:2, 37:8, 37:9, 39:8, 39:17, 39:18, 61:25, 71:17
**facts** [1] - 48:15
**failure** [1] - 7:14
**failure)** [1] - 7:18
**fairly** [2] - 33:4, 70:10
**faith** [3] - 60:2, 60:8, 60:20
**fall** [8] - 18:22, 19:7, 34:10, 45:9, 69:2, 70:10, 71:5, 72:23
**fallacy** [1] - 51:1
**falls** [1] - 68:3
**familiar** [1] - 26:15
**fantastic** [2] - 3:16, 4:17
**Fantastic** [1] - 4:7
**far** [6] - 9:1, 18:2, 20:18, 31:12, 31:18, 62:4
**FARR** [1] - 2:6
**Farr** [2] - 4:1, 35:14
**favorable** [1] - 58:14
**federal** [1] - 38:16
**fee** [1] - 24:1
**fees** [2] - 23:23, 24:2
**few** [2] - 47:20, 47:24
**field** [1] - 40:13
**fight** [2] - 13:20, 71:14
**figure** [2] - 31:4, 76:21
**filed** [5] - 5:22, 5:24, 21:12, 22:15, 26:6
**FILED** [1] - 79:17
**files** [1] - 34:12
**final** [2] - 22:10, 63:14
**finally** [1] - 60:21

**financial** [6] - 10:19, 27:23, 28:5, 28:6, 53:22, 55:3
**fine** [1] - 49:9
**finger** [1] - 41:14
**FIONA** [1] - 1:20
**Fiona** [1] - 3:12
**firm** [1] - 4:2
**first** [33] - 3:4, 3:20, 4:23, 5:2, 6:15, 7:17, 10:1, 10:15, 10:25, 13:7, 16:2, 17:3, 17:5, 20:8, 28:5, 29:23, 36:16, 37:11, 37:21, 42:6, 50:1, 52:15, 54:3, 54:15, 54:25, 55:9, 55:22, 57:13, 62:16, 66:5, 68:21
**fit** [3] - 20:14, 20:23, 20:24
**five** [3] - 17:24, 17:25, 72:5
**flat** [1] - 17:14
**focus** [2] - 8:22, 37:5
**focusing** [1] - 41:4
**folks** [3] - 10:24, 46:24, 77:6
**following** [1] - 41:3
**FOR** [1] - 1:2
**forecasts** [1] - 55:4
**foregoing** [2] - 79:8, 79:14
**foreign** [43] - 5:12, 5:15, 6:18, 9:12, 9:17, 9:19, 19:1, 23:6, 23:20, 25:14, 26:2, 26:3, 26:7, 26:22, 27:4, 29:9, 37:24, 38:11, 38:17, 38:18, 39:10, 39:13, 40:12, 40:16, 40:18, 40:19, 41:2, 41:9, 43:18, 43:22, 43:24, 44:2, 44:3, 44:7, 44:13, 44:14, 51:10, 58:6, 58:13, 59:4, 59:22, 60:24, 71:20
**foremost** [1] - 40:13
**formal** [3] - 11:12, 11:24, 15:8
**forth** [2] - 8:6, 68:24
**forward** [2] - 48:14, 76:18
**foundation** [1] - 45:5
**four** [10] - 21:16, 21:17, 21:23, 51:12, 52:14, 56:21, 57:7, 62:9, 63:8, 77:25
**fourth** [2] - 47:11,

55:14
**framed** [1] - 44:18
**framework** [1] - 42:3
**France** [19] - 5:19, 6:2, 12:23, 21:23, 22:10, 25:21, 29:11, 29:19, 30:3, 31:12, 45:13, 51:13, 51:23, 59:11, 60:19, 63:21, 64:13, 67:20, 78:1
**fraud** [4] - 52:22, 53:14, 57:3, 65:10
**French** [91] - 6:8, 8:16, 8:18, 8:23, 8:25, 9:4, 9:9, 10:4, 10:5, 10:8, 10:20, 11:7, 11:21, 11:25, 15:18, 19:24, 20:25, 22:22, 23:3, 23:10, 23:19, 24:6, 24:17, 25:23, 27:12, 30:20, 30:23, 31:11, 31:17, 32:8, 33:9, 33:12, 33:24, 34:19, 34:21, 35:8, 35:21, 35:23, 36:1, 36:3, 36:6, 38:23, 38:24, 38:25, 39:22, 40:5, 40:6, 44:25, 45:2, 45:21, 46:11, 47:16, 47:17, 50:1, 50:20, 51:3, 51:15, 52:12, 54:10, 54:19, 54:24, 56:23, 56:25, 58:21, 60:13, 61:1, 62:3, 62:10, 64:2, 64:14, 64:16, 64:19, 65:15, 66:2, 66:8, 67:4, 67:6, 67:12, 67:14, 68:6, 68:9, 68:11, 68:17, 69:15, 70:13, 73:3, 73:17, 75:5, 78:9, 78:12
**friends** [1] - 3:25
**front** [1] - 70:14
**full** [1] - 4:19
**fundamental** [7] - 35:16, 36:20, 36:24, 42:5, 42:19, 42:20, 44:20
**fundamentally** [1] - 63:24

## G

**Gallagher** [2] - 4:2, 35:14
**GALLAGHER** [1] - 2:6
**gather** [1] - 53:11
**gathered** [1] - 6:17
**gathering** [1] - 39:14

**GATTUSO** [1] - 1:16
**Gattuso** [1] - 3:7
**Gaul** [1] - 4:11
**GAUL** [2] - 2:10, 4:10
**Geddes** [1] - 4:12
**GEDDES** [1] - 2:10
**general** [1] - 24:17
**generalized** [1] - 17:20
**generalizing** [1] - 45:11
**generally** [4] - 23:21, 30:10, 44:15, 68:18
**GFP** [1] - 58:5
**given** [7] - 45:22, 47:10, 53:10, 70:8, 71:16, 78:9
**Golsheiny** [1] - 54:17
**governmental** [2] - 38:12, 38:17
**governments** [1] - 38:18
**grant** [7] - 39:7, 42:10, 42:12, 49:5, 49:11, 55:10, 61:5
**granted** [9] - 9:15, 37:13, 46:15, 46:16, 49:17, 52:1, 56:1, 61:10, 75:8
**great** [3] - 33:14, 33:17, 75:3
**gritty** [1] - 33:12
**group** [1] - 3:24
**guess** [14] - 14:3, 14:11, 14:16, 16:7, 23:1, 24:22, 27:19, 34:5, 39:11, 62:11, 67:23, 72:2, 73:25, 76:6
**guessing** [1] - 44:2
**guidance** [1] - 64:14
**guided** [1] - 57:9

## H

**hac** [2] - 3:14, 4:5
**hand** [2] - 29:14, 30:15
**handful** [2] - 71:4, 72:13
**handle** [1] - 4:5
**hands** [4] - 43:20, 45:14, 45:19, 51:20
**Hannelore** [1] - 4:14
**HANNELORE** [1] - 2:13
**happy** [4] - 22:21, 27:20, 45:2, 49:20
**hard** [3] - 68:22, 70:4,

78:21
**Hatcher** [1] - 1:12
**head** [2] - 21:14, 44:19
**heads** [1] - 44:1
**hear** [2] - 4:23, 36:15
**heard** [6] - 7:21, 18:2, 18:3, 63:21, 73:14, 79:10
**hearing** [3] - 22:24, 63:3, 70:12
**HEARING** [1] - 1:9, 1:11, 79:16
**held** [5] - 8:7, 24:8, 49:15, 56:12, 76:15
**help** [7] - 10:2, 14:10, 16:23, 29:4, 29:5, 29:21, 71:24
**Help** [1] - 66:2
**helpful** [3] - 12:12, 57:9, 78:22
**hereby** [1] - 79:5
**herself** [1] - 52:6
**HEYMAN** [1] - 1:16
**Heyman** [1] - 3:6
**highlight** [1] - 52:15
**Hirzel** [1] - 3:7
**HIRZEL** [1] - 1:16
**hit** [1] - 75:21
**hits** [1] - 74:2
**hold** [1] - 34:3
**holding** [5] - 8:23, 8:25, 9:5, 64:18, 65:25
**Honor** [63] - 3:6, 3:22, 4:11, 5:1, 6:16, 9:21, 10:7, 12:18, 17:2, 21:10, 22:20, 23:9, 24:11, 30:7, 31:5, 32:14, 33:13, 35:4, 35:13, 35:15, 37:11, 38:21, 40:4, 41:13, 42:4, 43:5, 46:5, 48:1, 49:2, 49:20, 50:5, 50:14, 50:15, 51:1, 51:6, 51:11, 51:18, 51:19, 51:21, 57:7, 58:16, 58:22, 60:7, 60:21, 61:12, 61:22, 62:14, 63:9, 63:15, 63:24, 64:23, 66:4, 66:25, 67:21, 68:19, 70:14, 72:2, 72:21, 74:8, 75:17, 78:5, 78:7, 78:8
**Honor's** [1] - 3:13
**Honorable** [1] - 1:11
**hope** [1] - 77:12
**hopeful** [1] - 35:6
**house** [1] - 4:19
**Huntriss** [1] - 3:12

**HUNTRISS** [1] - 1:20
**hypothesize** [1] - 74:2
**hypothetical** [1] - 74:1

## I

**ID** [1] - 53:3
**idea** [2] - 66:19, 67:17
**identified** [4] - 25:10, 36:18, 37:20, 48:2
**identify** [4] - 24:16, 36:23, 47:24, 64:8
**identifying** [1] - 24:25
**ignore** [2] - 16:20, 45:18
**imagine** [1] - 68:22
**immutable** [1] - 37:15
**impact** [1] - 28:22
**implicate** [6] - 19:13, 19:19, 21:6, 34:1, 60:12, 75:19
**implicated** [1] - 16:14
**implicates** [1] - 18:17
**important** [1] - 60:21
**importantly** [1] - 6:21
**improper** [1] - 60:13
**improperly** [1] - 72:23
**IN** [2] - 1:1, 1:2
**inappropriate** [1] - 47:12
**INC** [2] - 1:7, 79:10
**inclined** [1] - 45:2
**include** [3] - 5:21, 7:11, 72:9
**included** [2] - 5:18, 74:4
**includes** [1] - 7:6
**including** [11] - 3:9, 6:3, 7:9, 21:16, 21:17, 21:24, 55:3, 61:15, 66:7, 74:4, 74:5
**incomplete** [1] - 5:21
**incorporated** [4] - 57:20, 58:19, 61:14, 61:19
**incorrect** [2] - 6:14, 66:20
**independent** [2] - 40:15, 53:22
**India** [4] - 8:22, 12:3, 57:19, 73:13
**Indian** [6] - 57:17, 57:19, 57:25, 58:3, 58:11
**indicated** [3] - 43:25, 77:9
**indicates** [1] - 9:5
**indications** [1] - 60:8

**information** [34] - 9:7, 12:15, 12:24, 13:14, 15:20, 25:25, 35:22, 36:7, 42:14, 42:16, 44:24, 46:12, 48:7, 48:9, 50:21, 53:2, 53:5, 53:11, 53:19, 53:21, 55:3, 55:12, 56:1, 56:6, 56:10, 56:11, 57:3, 58:7, 58:9, 58:12, 67:5, 67:14, 67:16
**infringement** [1] - 57:18
**initiated** [1] - 54:23
**ink** [1] - 6:12
**inquire** [2] - 18:18, 22:22
**inquiries** [1] - 16:21
**inquiry** [11] - 16:15, 16:16, 18:10, 18:11, 18:18, 18:19, 18:24, 23:25, 40:2, 44:12
**installation** [1] - 68:21
**instance** [7] - 6:15, 7:17, 17:5, 28:5, 50:2, 61:16, 62:16
**instances** [1] - 13:17
**instruction** [2] - 6:23, 72:5
**Intel** [25] - 10:1, 16:5, 16:13, 18:24, 19:8, 36:19, 37:1, 37:8, 37:19, 37:20, 39:8, 39:17, 42:18, 43:16, 43:17, 44:5, 44:6, 44:11, 47:11, 57:10, 58:24, 60:3, 61:25, 71:17
**intend** [1] - 70:13
**interest** [1] - 5:14
**interesting** [1] - 69:19
**intergovernmental** [1] - 38:12
**internal** [3] - 20:14, 27:6, 28:9
**international** [2] - 37:23, 38:17
**interpret** [1] - 33:8
**interrupting** [1] - 67:23
**intervened** [1] - 8:12
**intervenor** [9] - 4:9, 5:16, 15:10, 24:20, 28:21, 50:5, 50:12, 60:15, 66:22
**Intervenor** [2] - 2:14, 78:6
**intervention** [1] - 77:8
**introductory** [1] - 40:9

**investigate** [1] - 53:8
**investigated** [1] - 53:13
**investigation** [1] - 52:18
**invite** [1] - 36:13
**involve** [2] - 69:3, 78:11
**involved** [10] - 10:4, 10:9, 10:14, 10:15, 10:24, 11:10, 14:3, 52:23, 59:23, 70:1
**involvement** [2] - 11:13, 50:23
**involving** [4] - 19:6, 46:23, 54:12
**issue** [32] - 6:15, 6:19, 7:5, 7:18, 7:22, 7:25, 8:4, 8:8, 8:12, 10:21, 30:5, 30:21, 34:23, 35:7, 35:18, 35:19, 36:11, 36:21, 46:6, 47:25, 48:11, 49:10, 57:8, 60:22, 62:12, 63:6, 64:4, 65:22, 70:14, 72:14, 77:21, 78:16
**issued** [6] - 46:7, 55:15, 57:16, 62:4, 64:6, 71:23
**issues** [20] - 5:5, 5:6, 9:12, 49:7, 51:24, 52:13, 53:12, 64:14, 64:16, 64:18, 65:5, 65:14, 66:12, 72:18, 75:20, 76:16, 76:19, 78:9, 78:14
**issuing** [1] - 44:23, 61:2
**items** [1] - 72:17
**itself** [11] - 12:12, 13:19, 13:21, 14:12, 15:8, 16:18, 18:23, 19:23, 43:10, 45:12, 47:11

## J

**JACQUELINE** [1] - 2:13
**Jacqueline** [1] - 4:14
**JAMIE** [1] - 1:16
**Jamie** [1] - 3:6
**job** [1] - 24:25
**joined** [3] - 3:8, 3:24, 4:12
**Jonathan** [1] - 3:25
**JONATHAN** [1] - 2:4
**Judge** [2] - 57:15,

57:21
**judge** [1] - 64:13
**judgment** [1] - 62:18
**judicial** [1] - 52:18
**July** [2] - 25:8, 62:18
**jump** [2] - 4:20, 36:13
**juncture** [1] - 22:10
**jurisdiction** [6] - 11:7, 11:21, 25:14, 58:21, 59:4, 59:7

## K

**keep** [2] - 7:19, 77:24
**keeping** [1] - 11:18
**key** [1] - 4:4
**kick** [1] - 49:10
**Kincaid** [1] - 77:18
**kind** [11] - 6:18, 13:14, 14:8, 16:7, 22:13, 23:2, 26:23, 56:17, 56:22, 57:1, 75:21
**known** [2] - 52:16, 54:22
**knows** [1] - 30:7
**KYMA** [2] - 1:3, 79:9

## L

**lack** [1] - 22:16
**laid** [1] - 46:8
**last** [9] - 6:10, 7:20, 24:23, 29:4, 30:19, 32:12, 38:6, 55:15, 73:14
**late** [1] - 23:3
**Laura** [1] - 1:12
**law** [25] - 5:5, 6:19, 9:12, 20:25, 33:9, 33:12, 34:21, 35:21, 36:24, 40:5, 40:6, 40:18, 41:2, 44:25, 46:11, 60:6, 60:13, 64:6, 64:14, 64:19, 65:15, 66:2, 67:6, 68:17, 78:9
**LAWRENCE** [1] - 2:7
**Lawrence** [1] - 4:3
**lawyer** [2] - 31:11, 40:8
**lawyers** [2] - 3:3, 3:19
**LDH** [1] - 1:6
**least** [5] - 16:11, 29:15, 32:23, 64:11, 70:10
**leave** [8] - 5:4, 7:16, 9:16, 17:13, 31:7, 75:8, 76:18, 78:18

**Lee** [1] - 4:3
**LEE** [1] - 2:7
**left** [6] - 21:7, 58:8, 64:17, 65:25, 68:8
**legal** [5] - 70:1, 70:2, 72:16, 75:20, 75:21
**legally** [1] - 37:13
**legislation** [1] - 45:3
**less** [1] - 58:14
**letter** [5] - 6:1, 23:23, 69:5, 74:6, 77:17
**level** [1] - 28:10
**light** [1] - 60:18
**LIKE** [1] - 50:14
**likely** [2] - 16:11, 17:4
**limitation** [1] - 20:25
**LIMITED** [2] - 1:3, 79:9
**limited** [2] - 56:14, 73:10
**limiting** [1] - 41:4
**limits** [1] - 31:20
**line** [8] - 3:2, 3:8, 3:18, 4:2, 32:11, 33:15, 77:4, 78:19
**list** [1] - 23:14
**listen** [1] - 19:11
**litigation** [7] - 10:4, 12:1, 28:24, 37:23, 51:10, 59:23, 61:21
**LLC** [2] - 3:24, 79:23
**LLP** [7] - 1:16, 1:18, 2:3, 2:6, 2:12, 3:7, 3:9
**located** [1] - 26:5
**lock** [2] - 7:12, 30:15
**lock-up** [1] - 7:12
**lockup** [3] - 50:24, 62:25, 63:3
**log** [6] - 6:25, 7:1, 13:24, 31:3, 34:18, 64:8, 68:7, 68:9, 68:15, 69:22, 73:22, 74:3, 75:15
**logged** [5] - 8:7, 31:5, 34:18, 65:2, 73:22
**LOMBARDI** [15] - 2:6, 35:12, 40:3, 41:12, 42:4, 44:17, 45:17, 46:5, 47:2, 48:18, 49:1, 50:4, 63:15, 63:23, 78:4
**Lombardi** [16] - 4:3, 4:4, 35:11, 35:13, 39:16, 50:10, 51:16, 60:22, 63:12, 65:24, 67:7, 67:17, 68:2, 70:16, 71:2, 72:12
**Lombardi's** [1] - 70:5
**London** [1] - 3:11
**look** [14] - 12:21,

15:17, 17:9, 19:18, 27:23, 30:23, 32:19, 50:16, 53:3, 60:9, 65:21, 70:16, 71:18, 76:14
**looked** [1] - 57:23
**looking** [5] - 16:4, 53:3, 73:16, 73:18, 76:18
**looks** [1] - 18:5
**lose** [1] - 75:3
**losing** [1] - 7:19
**lost** [2] - 7:22, 36:5

## M

**mail** [2] - 14:25, 25:8
**mailed** [1] - 20:1
**mails** [1] - 27:6
**maintain** [1] - 30:1
**mandate** [1] - 42:7
**map** [1] - 65:17
**massive** [1] - 47:9
**material** [3] - 25:21, 38:4, 50:21
**materials** [1] - 6:14
**matter** [6] - 26:14, 26:16, 50:18, 70:12, 76:7, 77:5
**matters** [1] - 16:10
**mean** [4] - 31:6, 46:18, 63:18, 71:2
**meaning** [1] - 32:21
**meaningful** [1] - 23:8
**means** [1] - 69:24
**meantime** [1] - 77:6
**meanwhile** [1] - 34:4
**meat** [1] - 18:4
**mechanism** [4] - 41:10, 64:12, 64:15, 68:12
**mediation** [10] - 11:11, 11:13, 14:17, 14:18, 14:20, 14:21, 14:24, 15:1, 35:24, 46:25
**mediator** [1] - 15:6
**meet** [13] - 5:8, 8:5, 18:13, 31:3, 74:7, 76:20, 76:24, 77:1, 77:7, 77:11, 77:14, 77:19, 78:16
**meet-and-confer** [13] - 5:8, 8:5, 18:13, 31:3, 74:7, 76:20, 76:24, 77:1, 77:7, 77:11, 77:14, 77:19, 78:16
**member** [1] - 10:17
**mentioned** [4] - 55:16,

59:16, 60:22, 61:12
**merely** [1] - 67:25
**merits** [1] - 36:5
**mess** [1] - 64:22
**met** [1] - 39:6
**might** [9] - 8:2, 9:10, 15:24, 31:8, 49:25, 56:9, 62:12, 62:22, 71:15
**million** [1] - 18:15
**mind** [4] - 11:18, 16:6, 32:18, 47:20
**mindful** [1] - 74:1
**minority** [1] - 53:15
**misuse** [1] - 36:10
**modifications** [1] - 76:22
**modified** [1] - 77:1
**moment** [1] - 64:1
**months** [2] - 22:6, 74:16
**Morris** [1] - 3:22
**MORRIS** [1] - 2:3
**mostly** [1] - 23:3
**MOTION** [3] - 1:9, 1:11, 79:16
**motion** [6] - 25:20, 26:18, 34:12, 34:25, 63:18, 63:19
**move** [2] - 67:16, 68:6
**moved** [1] - 67:19
**MR** [15] - 3:21, 35:12, 40:3, 41:12, 42:4, 44:17, 45:17, 46:5, 47:2, 48:18, 49:1, 50:4, 63:15, 63:23, 78:4
**MS** [44] - 3:5, 4:10, 4:25, 7:23, 9:25, 10:6, 10:13, 11:4, 11:23, 12:17, 13:4, 13:10, 13:16, 14:15, 17:2, 18:21, 19:15, 21:8, 21:14, 21:19, 21:25, 22:19, 23:9, 24:10, 25:3, 25:23, 26:19, 27:2, 27:19, 29:22, 32:14, 33:13, 34:15, 35:3, 50:13, 62:14, 64:23, 66:4, 68:18, 72:1, 73:25, 75:16, 78:6, 78:8
**must** [1] - 42:17

## N

**Nantier** [1] - 53:24
**napkin** [2] - 47:7, 71:3
**narrow** [1] - 60:4

**narrower** [1] - 75:14
**narrowing** [1] - 18:14
**narrowly** [1] - 10:23
**Nasir** [1] - 4:4
**NASIR** [1] - 2:8
**nations** [1] - 38:11
**nature** [1] - 76:2
**necessarily** [2] - 11:11, 28:11
**necessary** [2] - 25:7, 49:7
**need** [9] - 6:22, 13:20, 26:6, 27:11, 37:8, 48:8, 53:13, 62:21, 76:22
**needed** [1] - 53:11
**needs** [4] - 19:11, 52:10, 59:1, 63:5
**negotiate** [2] - 17:15, 52:8
**negotiation** [1] - 69:12
**negotiations** [6] - 10:12, 14:5, 14:9, 14:13, 50:23
**never** [11] - 8:24, 10:7, 16:6, 29:10, 29:12, 29:16, 45:22, 47:8, 54:19, 69:22, 75:19
**NEW** [2] - 79:3, 79:18
**next** [2] - 22:24
**Nice** [1] - 41:16
**nice** [1] - 78:24
**NICHOLS** [1] - 2:3
**Nichols** [1] - 3:22
**nine** [1] - 71:12
**nitty** [1] - 33:12
**nitty-gritty** [1] - 33:12
**non** [2] - 26:22, 48:20
**non-party** [1] - 26:22
**non-privileged** [1] - 48:20
**none** [2] - 30:17, 59:25
**nonparticipant** [2] - 10:23, 11:2
**nonparties** [1] - 9:16
**nonprevailing** [1] - 24:3
**noon** [2] - 68:24, 74:11
**note** [5] - 29:23, 38:1, 40:14, 41:17, 55:17
**noted** [2] - 40:8, 57:23
**notes** [1] - 79:13
**nothing** [5] - 32:3, 52:22, 72:11, 74:17, 74:21
**notice** [3] - 5:22, 22:5, 55:18
**notion** [2] - 29:13,

71:8
**November** [1] - 22:25
**nowhere** [1] - 43:2
**Number** [1] - 79:9
**number** [16] - 6:7, 7:9, 12:22, 19:18, 20:24, 21:21, 23:13, 24:15, 25:4, 25:12, 27:3, 34:7, 34:14, 48:15, 48:16, 51:25
**numerous** [1] - 6:17

## O

**O'Keefe** [4] - 26:15, 29:6, 43:4, 45:15
**obligation** [1] - 66:17
**obligations** [3] - 11:15, 56:14, 76:2
**observed** [1] - 28:25
**obtain** [4] - 25:16, 26:7, 51:4, 53:5
**obtainable** [1] - 26:3
**obtained** [3] - 26:24, 30:2, 67:18
**obtaining** [1] - 41:10
**October** [1] - 62:22
**OF** [4] - 1:2, 1:9, 79:2, 79:3
**offense** [1] - 62:2
**offer** [1] - 78:10
**office** [2] - 3:11, 3:24
**OFFICIALLY** [1] - 79:17
**often** [2] - 6:19, 44:17
**once** [1] - 22:7
**one** [34] - 6:3, 8:14, 10:5, 12:17, 16:19, 21:9, 22:13, 24:22, 28:13, 28:23, 29:4, 30:15, 32:12, 34:7, 34:14, 37:1, 40:1, 40:10, 42:5, 42:19, 43:21, 49:1, 54:10, 54:12, 58:23, 58:25, 62:16, 62:22, 71:14, 71:18, 72:4, 73:14, 74:13, 77:16
**ongoing** [2] - 6:2, 6:5
**open** [5] - 19:2, 23:12, 25:4, 25:13, 32:9
**opening** [4] - 6:7, 24:16, 56:4, 60:10
**operating** [1] - 61:15
**opine** [1] - 27:21
**opinion** [3] - 43:2, 46:10, 64:17
**opportunity** [2] - 38:7, 63:13

**opposition** [1] - 37:5
**options** [1] - 68:8
**order** [14] - 12:11, 25:16, 28:16, 48:8, 52:20, 53:13, 54:23, 57:2, 60:2, 60:24, 72:17, 77:6, 77:21, 77:24
**ordered** [6] - 12:6, 38:22, 49:6, 53:18, 59:18, 65:1
**Orpea** [20] - 4:12, 4:15, 8:12, 8:14, 8:15, 15:18, 28:21, 40:16, 50:5, 50:14, 52:19, 52:22, 53:7, 53:9, 53:23, 56:13, 56:16, 61:16, 69:20, 73:3
**Orpea's** [4] - 50:22, 52:21, 55:2
**otherwise** [7] - 6:24, 8:9, 9:8, 17:20, 20:2, 72:6, 72:8
**ought** [3] - 12:4, 31:7, 34:20
**outset** [1] - 38:2
**outside** [7] - 7:10, 14:1, 69:3, 71:5, 72:11, 72:24, 74:14
**overbroad** [1] - 54:7
**overstate** [1] - 32:21
**overview** [1] - 51:17
**own** [1] - 24:2

## P

**page** [8] - 6:7, 24:15, 41:17, 49:2, 53:3, 60:10, 66:14, 67:9
**pages** [3] - 18:15, 38:5, 79:15
**Pallas** [1] - 3:9
**PALLAS** [1] - 1:18
**paper** [4] - 47:6, 47:7, 47:21, 47:24
**papers** [1] - 6:11
**paperwork** [1] - 14:19
**paragraphs** [3] - 40:9, 68:25, 74:12
**paraphrase** [1] - 41:1
**part** [3] - 48:25, 55:5, 73:11
**partial** [1] - 12:7
**participant** [2] - 11:1, 51:10
**participants** [1] - 37:22
**participated** [1] -

10:18
**particular** [3] - 8:20, 37:2, 62:1
**particularly** [2] - 47:13, 70:8
**parties** [44] - 5:12, 6:25, 8:18, 9:7, 10:5, 10:7, 10:10, 10:20, 11:3, 11:15, 13:12, 16:22, 17:15, 24:2, 26:21, 27:1, 27:4, 27:6, 27:12, 27:16, 27:24, 28:1, 28:3, 28:11, 28:24, 30:16, 33:20, 35:1, 36:6, 43:13, 46:20, 46:23, 51:8, 53:18, 62:20, 63:3, 63:17, 64:15, 64:21, 74:5, 77:13, 77:20, 77:23, 77:24
**parties'** [1] - 78:11
**PARTNERS** [3] - 1:7, 1:18, 79:10
**partners** [2] - 3:9, 3:23
**parts** [1] - 45:25
**party** [17] - 9:5, 11:5, 11:12, 14:25, 15:13, 15:15, 19:24, 20:12, 24:4, 26:22, 28:21, 29:1, 40:21, 58:13, 59:22, 62:17
**passed** [1] - 35:24
**passing** [1] - 43:10
**PATEL** [1] - 1:20
**Patel** [1] - 3:12
**patent** [1] - 57:18
**path** [1] - 77:12
**pause** [1] - 71:22
**peer** [2] - 44:1, 44:19
**pending** [2] - 62:10, 62:16
**people** [4] - 13:17, 22:5, 28:4, 28:16
**period** [5] - 7:8, 20:17, 68:20, 70:10, 76:11
**permissibility** [2] - 16:15, 18:18
**permission** [1] - 3:13
**permit** [3] - 16:18, 16:21, 17:1
**permitted** [3] - 12:16, 13:3, 41:8
**permitting** [1] - 38:16
**perpetuated** [3] - 52:22, 53:15, 57:4
**personal** [1] - 34:15
**perspective** [1] - 29:5
**petition** [3] - 26:6, 67:3, 75:7
**petitioner** [21] - 3:2,

4:22, 9:15, 10:3, 13:15, 14:5, 19:11, 24:24, 26:4, 29:10, 34:11, 34:12, 34:24, 39:19, 45:6, 45:11, 48:12, 49:23, 64:7, 68:3, 77:9
**petitioner's** [5] - 5:22, 7:16, 28:17, 40:18, 60:9
**Petitioners** [2] - 3:15, 32:3
**petitioners** [31] - 3:8, 5:10, 5:24, 13:8, 16:10, 21:6, 23:17, 25:19, 26:12, 28:14, 31:14, 35:18, 35:19, 36:1, 36:8, 40:19, 41:25, 42:21, 45:15, 48:1, 48:4, 48:5, 49:3, 51:7, 54:18, 54:21, 55:16, 56:3, 60:5, 62:25, 64:10
**phone** [1] - 64:13
**phonetic** [2] - 53:24, 54:17
**phrase** [2] - 43:1, 43:7
**pick** [2] - 41:14, 64:12
**pieces** [4] - 32:15, 47:7, 47:20, 47:24
**pit** [1] - 56:25
**PJT** [13] - 1:7, 3:23, 4:6, 8:17, 10:19, 13:8, 26:20, 27:2, 50:17, 50:18, 59:8, 61:16, 79:10
**PJT's** [2] - 61:23, 69:5
**place** [1] - 64:20
**Plaintiff** [1] - 1:21
**Plaintiffs** [1] - 1:4
**plan** [7] - 27:14, 27:17, 35:23, 54:3, 62:19, 73:21, 74:1
**planning** [3] - 36:12, 36:25, 37:5
**plans** [1] - 55:4
**pleading** [1] - 26:4
**pleadings** [2] - 62:20, 62:21
**plus** [2] - 14:14, 16:13
**point** [33] - 5:17, 6:10, 6:18, 7:16, 8:19, 16:2, 16:3, 16:5, 24:23, 26:12, 30:19, 36:14, 39:23, 40:23, 40:24, 44:11, 48:5, 48:12, 48:23, 58:22, 65:21, 66:5, 66:13, 66:25, 68:1, 68:22, 71:6, 71:9, 73:2,

75:3, 75:22, 76:23
**pointed** [1] - 48:19
**points** [6] - 5:1, 8:11, 14:3, 29:21, 39:19, 67:23
**policies** [1] - 39:14
**position** [8] - 46:21, 47:2, 50:7, 65:14, 65:16, 67:8, 70:5, 74:20
**positioned** [1] - 67:4
**possess** [1] - 27:5
**possibility** [1] - 19:2
**possible** [3] - 28:8, 47:6, 57:2
**posture** [1] - 5:3
**potential** [3] - 53:9, 56:4, 57:3
**potentially** [2] - 9:19, 28:16
**power** [1] - 59:9
**practical** [1] - 76:7
**pre** [2] - 25:20, 26:17
**precisely** [4] - 20:15, 41:9, 58:15, 65:15
**preclude** [1] - 25:24
**predicate** [1] - 39:3
**predictably** [1] - 33:4
**preempt** [1] - 52:11
**present** [1] - 79:7
**presentation** [3] - 4:6, 16:3, 62:7
**presented** [1] - 9:1
**presenting** [2] - 4:15, 42:22
**press** [3] - 20:2, 48:6, 56:12
**pressured** [1] - 28:8
**presumably** [1] - 75:20
**pretty** [4] - 17:11, 57:9, 71:22, 77:12
**prevail** [1] - 72:17
**primarily** [3] - 50:15, 51:9, 57:25
**primary** [1] - 58:24
**privilege** [88] - 6:24, 7:1, 7:11, 12:3, 15:4, 16:12, 16:15, 16:25, 17:7, 17:21, 18:12, 18:17, 19:14, 20:15, 30:14, 30:18, 31:2, 31:12, 31:18, 31:19, 32:24, 33:6, 34:1, 34:11, 34:18, 35:2, 35:17, 37:6, 37:14, 38:23, 39:21, 39:25, 40:5, 40:6, 40:7, 41:6, 42:8, 42:23, 44:8, 45:9, 46:2,

46:18, 47:1, 47:5, 49:6, 49:10, 49:11, 51:16, 52:2, 52:3, 54:9, 56:7, 60:12, 60:19, 61:11, 63:20, 64:3, 64:11, 64:19, 65:2, 65:4, 65:6, 65:13, 65:15, 66:2, 66:6, 66:9, 66:13, 66:20, 67:25, 68:7, 68:8, 68:15, 69:2, 69:13, 69:22, 71:19, 72:8, 72:24, 73:22, 73:24, 74:3, 74:14, 75:15, 75:19, 75:22, 76:1
**privileged** [22] - 6:13, 7:2, 15:10, 15:11, 31:9, 31:16, 34:18, 35:20, 38:3, 42:14, 42:15, 44:24, 46:12, 48:10, 48:20, 64:8, 68:23, 69:24, 70:22, 71:12, 72:6, 73:6
**privy** [2] - 28:18, 28:20
**pro** [2] - 3:14, 4:5
**problem** [1] - 76:4
**procedural** [2] - 5:3, 68:12
**procedure** [6] - 14:1, 14:7, 20:8, 20:11, 20:23, 72:10
**procedures** [1] - 45:13
**proceed** [1] - 71:15
**proceeding** [19] - 5:13, 5:15, 5:23, 5:25, 6:4, 9:17, 11:9, 23:7, 24:25, 25:14, 25:15, 26:7, 27:13, 52:16, 52:20, 62:24, 63:4, 63:6, 70:2
**proceedings** [43] - 6:1, 7:9, 7:12, 7:13, 8:16, 8:18, 9:20, 10:5, 10:8, 10:21, 11:12, 13:2, 21:5, 23:3, 23:11, 25:1, 25:4, 25:11, 26:21, 27:1, 27:4, 27:7, 29:9, 30:16, 40:17, 40:20, 41:2, 50:6, 50:20, 50:24, 50:25, 51:4, 52:6, 54:14, 54:20, 56:23, 58:6, 62:15, 62:17, 73:2, 79:8
**proceeds** [1] - 49:8
**process** [14] - 5:8, 5:9, 8:5, 11:25, 22:12, 23:20, 28:15, 31:3,

46:25, 73:11, 76:20, 76:24, 77:2, 77:19
**processes** [1] - 23:21
**produce** [3] - 34:13, 46:3, 74:21
**produced** [6] - 7:7, 8:25, 34:20, 53:23, 75:1, 75:2
**production** [10] - 8:8, 9:10, 12:11, 15:24, 42:13, 42:15, 44:23, 44:24, 59:9, 59:14
**proffer** [1] - 17:18
**prohibit** [1] - 47:17
**prohibited** [2] - 41:21, 41:25
**prohibition** [1] - 42:13
**prohibits** [1] - 42:23
**promotes** [1] - 38:18
**proof** [4] - 39:14, 42:22, 43:7, 67:11
**proof-gathering** [1] - 39:14
**proper** [1] - 36:21
**properly** [2] - 66:10, 68:16
**proposed** [1] - 58:5
**proposition** [1] - 43:6
**propounded** [1] - 50:17
**prosecutor** [1] - 12:8
**protected** [2] - 52:10, 56:6
**protection** [2] - 41:5, 60:12
**protections** [1] - 61:7
**prove** [1] - 67:12
**proverbial** [1] - 29:24
**provide** [3] - 37:25, 53:7, 60:24
**provided** [3] - 47:18, 51:17, 55:2
**providing** [1] - 28:6, 37:21, 61:1
**provision** [2] - 6:21, 6:25
**provisions** [2] - 40:11, 59:13
**public** [3] - 7:10, 9:2, 56:13
**publicly** [1] - 48:7
**pull** [1] - 19:16
**purpose** [12] - 36:18, 36:19, 37:17, 38:9, 38:15, 38:21, 44:18, 44:20, 44:22, 45:1, 47:10, 47:14
**purposes** [1] - 11:21, 40:1, 43:15
**put** [4] - 41:14, 71:2,

75:11, 76:17
**putting** [1] - 22:11

## Q

**qualified** [1] - 15:12
**quantified** [1] - 76:17
**quash** [2] - 63:19, 71:13
**questionably** [1] - 7:10
**questioning** [1] - 58:8
**questions** [8] - 9:21, 9:24, 16:8, 16:17, 34:2, 34:21, 36:14, 49:21
**quite** [2] - 40:17, 46:18
**quotes** [1] - 38:4
**quoting** [1] - 43:9

## R

**raise** [1] - 70:14
**raised** [2] - 8:19, 32:18
**range** [6] - 7:5, 13:25, 20:19, 52:19, 55:21, 69:3
**rather** [2] - 36:15, 58:10
**reach** [3] - 36:9, 37:8, 77:17
**reached** [2] - 46:6, 77:20
**read** [2] - 35:6, 56:2
**real** [2] - 19:21, 42:16
**reality** [1] - 34:8
**really** [7] - 23:7, 40:6, 46:18, 56:22, 59:6, 69:1, 69:11
**reams** [2] - 47:5, 47:6
**reason** [4] - 15:22, 51:23, 58:16, 60:23
**reasonable** [2] - 46:19, 78:18
**reasonably** [1] - 25:15
**reasons** [2] - 46:8, 61:22
**received** [1] - 55:18
**receptive** [6] - 6:9, 30:10, 39:10, 43:18, 44:16, 67:13
**receptivity** [2] - 24:17, 44:13
**recipient** [3] - 58:8, 59:19, 59:22
**reciprocal** [1] - 38:19

**reciprocity** [3] - 44:21, 45:1, 60:25
**recognize** [1] - 21:1
**reconciliation** [2] - 10:11, 10:25
**recover** [1] - 15:2
**reduce** [2] - 23:4, 23:6
**refer** [1] - 22:22
**reference** [1] - 23:22
**referred** [2] - 42:20, 43:5
**referring** [2] - 41:20, 43:3
**refers** [1] - 66:16
**regard** [1] - 65:12
**regarding** [4] - 10:11, 27:13, 60:19, 63:19
**regardless** [4] - 19:3, 28:20, 32:9, 61:20
**regular** [2] - 69:21, 71:10
**reissue** [1] - 75:10
**rejected** [5] - 21:12, 51:14, 54:16, 55:8, 57:5
**relate** [6] - 14:7, 14:22, 57:25, 70:1, 70:6, 73:9
**related** [1] - 14:10
**relates** [3] - 70:17, 70:19, 70:21
**relating** [8] - 17:17, 54:2, 55:21, 55:25, 56:11, 56:15, 61:8, 62:24
**release** [1] - 56:10
**releases** [1] - 48:6
**relevance** [1] - 27:11
**relevant** [3] - 11:5, 27:17, 28:7
**religion** [1] - 49:12
**remain** [1] - 21:6
**remaining** [8] - 21:24, 49:25, 62:8, 63:8, 71:14, 77:25
**remind** [1] - 21:2
**Remming** [1] - 3:22
**REMMING** [2] - 2:3, 3:21
**repeat** [1] - 21:4
**repeatedly** [4] - 28:14, 57:1, 64:4, 76:15
**reply** [5] - 36:24, 42:6, 42:21, 49:2, 60:1
**reported** [1] - 79:7
**reporter** [1] - 41:17
**Reporter** [2] - 79:5, 79:6
**reports** [3] - 14:18, 28:3, 53:21

**represent** [1] - 40:15
**representation** [1] - 60:18
**representing** [1] - 3:23
**represents** [1] - 40:19
**request** [15] - 17:14, 17:16, 17:19, 19:12, 20:6, 20:9, 20:23, 25:19, 26:13, 34:7, 34:14, 46:1, 55:8, 55:11, 57:22
**requested** [11] - 8:1, 20:18, 31:22, 32:10, 42:24, 54:6, 54:14, 60:11, 67:19, 68:3, 70:25
**requesting** [2] - 20:20, 55:21
**requests** [18] - 8:2, 19:6, 19:18, 31:6, 46:13, 50:16, 50:19, 54:5, 54:7, 54:8, 57:23, 57:24, 58:7, 69:18, 73:10, 73:12, 75:18, 76:25
**require** [5] - 37:2, 42:10, 42:15, 47:12, 75:15
**required** [5] - 25:13, 42:8, 45:15, 51:21, 51:22
**requirement** [4] - 23:7, 26:2, 29:14, 45:18
**requirements** [1] - 39:5
**requiring** [3] - 17:15, 42:13, 44:22
**researched** [1] - 65:22
**resolve** [1] - 78:14
**resolved** [2] - 5:7, 8:4
**resort** [1] - 26:7
**respect** [4] - 6:10, 38:18, 61:24, 77:14
**respected** [1] - 66:18
**respectful** [1] - 41:1
**respecting** [1] - 38:11
**respond** [5] - 16:23, 32:16, 49:17, 63:13, 64:7
**respondent** [9] - 17:18, 24:23, 34:6, 34:13, 34:17, 45:10, 46:3, 58:10, 77:9
**respondent's** [5] - 11:17, 29:16, 46:21, 48:24, 67:1
**respondents** [25] - 3:19, 10:3, 13:5,

13:22, 20:10, 24:19, 29:8, 34:10, 35:6, 35:14, 40:16, 41:24, 42:21, 47:3, 48:3, 48:13, 60:15, 64:7, 66:6, 67:12, 69:19, 72:19, 73:23, 74:19, 78:4
**response** [2] - 25:2, 49:12
**responsive** [2] - 19:2, 32:15
**rest** [2] - 9:22, 48:10
**restrictions** [2] - 29:19, 39:14
**restructuring** [5] - 50:22, 52:21, 55:23, 73:1, 73:6
**result** [4] - 35:23, 36:10, 46:15, 56:9, 59:14, 59:17
**retaining** [1] - 27:25
**retention** [1] - 70:8
**reversed** [1] - 17:12
**review** [3] - 23:15, 65:3, 65:9
**reviews** [1] - 53:22
**revise** [1] - 76:5
**revised** [2] - 75:10, 77:22
**revoke** [2] - 54:23, 55:9
**ribber** [1] - 74:2
**rightfully** [1] - 56:12
**road** [2] - 49:10, 74:3
**roadblock** [2] - 56:22, 56:24
**role** [1] - 52:11
**route** [2] - 16:16, 18:19
**routinely** [1] - 24:3
**Rule** [1] - 23:25
**rule** [6] - 24:1, 33:8, 37:16, 42:9, 64:18, 68:14
**ruled** [2] - 30:21, 78:1
**rules** [6] - 25:24, 58:3, 58:4, 58:12, 58:14, 61:7
**ruling** [3] - 32:1, 32:4, 71:20
**rulings** [1] - 61:3
**run** [8] - 29:6, 29:9, 29:20, 33:10, 44:7, 51:7, 73:17, 76:1
**running** [1] - 45:14

## S

**sacrosanct** [1] - 52:1
**safeguard** [3] - 7:13, 30:15, 50:25
**safeguards** [1] - 62:19
**said/she** [1] - 30:4
**sake** [2] - 31:13, 31:14
**sat** [1] - 45:19
**satisfied** [3] - 16:5, 23:8, 59:12
**satisfy** [3] - 16:18, 19:8, 60:2
**scope** [10] - 5:5, 5:7, 9:13, 18:14, 33:6, 35:2, 35:16, 66:1, 72:12, 76:16
**SDI** [1] - 55:20
**SEALED** [1] - 79:17
**search** [1] - 47:23
**searches** [1] - 48:16
**second** [14] - 5:17, 10:16, 19:8, 36:23, 37:23, 41:15, 41:22, 43:15, 43:17, 55:22, 62:24, 68:23, 68:24, 74:11
**section** [4] - 36:10, 38:3, 38:15, 49:5
**see** [11] - 19:16, 19:25, 23:22, 27:15, 28:4, 28:9, 28:10, 33:16, 66:14, 72:1, 77:7
**seeing** [1] - 15:9
**seek** [19] - 12:25, 16:10, 23:18, 25:1, 25:11, 25:21, 26:23, 28:22, 36:8, 44:23, 46:12, 47:15, 51:8, 58:17, 58:20, 64:16, 69:18, 75:10, 75:13
**seeking** [22] - 5:4, 6:13, 8:13, 8:14, 8:16, 13:14, 13:15, 13:25, 18:22, 25:7, 26:4, 30:11, 30:12, 30:20, 30:23, 31:1, 45:23, 52:18, 52:19, 63:1, 72:22, 72:23
**seeks** [1] - 32:3
**seem** [2] - 12:8, 69:20
**send** [1] - 14:25
**sense** [6] - 41:11, 49:24, 50:3, 57:6, 70:3, 71:24
**separate** [1] - 54:13
**September** [5] - 1:13, 5:24, 63:4, 79:11, 79:20

series [2] - 53:12, 74:12
serious [1] - 71:22
serve [13] - 5:4, 5:11, 7:17, 9:16, 17:13, 31:7, 33:2, 33:3, 44:25, 67:2, 67:3, 75:8, 76:18
served [3] - 16:6, 44:22, 69:21
service [4] - 16:19, 16:21, 17:1, 61:6
set [8] - 5:2, 8:6, 16:24, 21:11, 22:24, 36:16, 54:21, 60:5
sets [1] - 68:24
settled [2] - 5:6, 31:12
settlement [2] - 14:23, 69:11
setup [1] - 71:16
seven [1] - 49:2
several [1] - 52:17
shareholders [1] - 56:14
shields [1] - 38:3
shifting [1] - 24:1
SHIREEN [1] - 1:19
Shireen [1] - 3:10
short [1] - 32:22
Shorthand [2] - 79:5, 79:6
shorthand [2] - 79:7, 79:13
show [2] - 31:24, 60:2
showing [1] - 6:8
shows [1] - 9:1
shrift [1] - 32:22
shut [1] - 28:15
side [1] - 6:20
SIGNED [1] - 79:17
significant [2] - 38:2, 60:14
similar [4] - 24:7, 37:25, 45:3, 50:19
similarly [2] - 13:12, 52:17
SIMOPOULOS [1] - 1:19
Simopoulos [1] - 3:10
simply [6] - 31:8, 41:19, 69:20, 74:20, 74:22, 77:21
single [2] - 48:20, 74:4
sitting [1] - 45:13
situated [3] - 13:12, 52:17, 54:22
situation [7] - 33:11, 34:6, 42:3, 43:20, 61:17, 65:8, 65:16
situations [2] - 33:17,

65:4
SKLAR [1] - 2:13
Sklar [1] - 4:14
SLUSKY [1] - 2:7
Slusky [1] - 4:3
so-and-so [1] - 25:8
solely [1] - 61:19
sorry [5] - 7:23, 12:17, 13:10, 21:9, 67:21
sort [12] - 12:14, 12:24, 21:5, 22:17, 22:23, 23:25, 31:1, 69:11, 71:4, 71:19, 76:16, 77:22
sorts [2] - 12:14, 46:4
sought [19] - 8:15, 12:15, 13:2, 13:5, 13:6, 13:18, 14:2, 23:5, 26:6, 26:16, 44:15, 45:8, 51:12, 53:1, 54:19, 56:23, 57:19, 67:6, 71:11
speaks [1] - 57:10
special [1] - 60:12
specific [10] - 19:4, 19:5, 22:1, 25:10, 30:6, 30:8, 44:14, 48:15, 76:9, 76:10
specifically [9] - 13:18, 17:16, 22:9, 24:20, 31:22, 32:10, 69:8, 75:23
specifics [1] - 76:14
Speedbudget [1] - 79:23
spilled [1] - 6:12
spin [1] - 19:17
square [4] - 11:1, 14:11, 29:5, 29:21
squarely [2] - 30:21, 34:8
ss [1] - 79:2
stage [1] - 5:2
stages [1] - 23:4
stand [2] - 43:6, 76:25
standard [8] - 28:23, 30:22, 43:10, 43:12, 43:13, 43:14, 44:18, 60:4
standing [1] - 37:4
start [2] - 38:10, 65:20
started [1] - 3:1
starting [2] - 3:3, 3:19
state [1] - 59:25
STATE [1] - 79:2
States [1] - 29:18
STATES [1] - 1:1
States' [1] - 6:20
statute [14] - 37:7, 37:12, 37:16, 37:17,

37:21, 38:8, 38:10, 42:10, 42:11, 42:18, 44:8, 44:20, 45:5, 47:10
statutes [1] - 37:1
statutorily [1] - 16:13
statutory [9] - 16:4, 36:17, 37:14, 38:9, 39:5, 39:18, 42:7, 61:25, 71:17
steer [2] - 10:18, 28:14
Steer [1] - 10:20
Stenotype [1] - 79:7
step [2] - 47:13, 63:25
still [4] - 62:16, 62:20, 62:22, 63:5
strictly [1] - 11:2
strip [1] - 19:12
STUART [1] - 2:6
Stuart [2] - 4:3, 35:13
stuck [1] - 71:7
stuff [6] - 19:12, 29:11, 29:17, 70:17, 70:19, 70:20
subject [15] - 7:14, 8:3, 8:9, 11:20, 12:25, 31:2, 36:16, 37:11, 40:8, 47:1, 50:19, 59:5, 61:18, 61:21, 65:1
subjects [3] - 35:17, 35:20, 36:13
submission [4] - 5:20, 8:20, 15:17, 66:15
submissions [1] - 15:9
submit [8] - 23:14, 25:9, 25:11, 45:20, 51:18, 60:7, 60:16, 60:20
submitted [17] - 5:16, 5:23, 6:4, 6:12, 6:18, 14:19, 15:7, 22:3, 23:16, 24:12, 31:10, 62:21, 66:7, 66:22, 66:23, 69:18
submitting [1] - 62:20
subpoena [26] - 5:4, 5:11, 6:21, 7:6, 7:17, 8:2, 9:16, 16:6, 16:19, 31:7, 33:3, 45:8, 49:12, 59:20, 61:6, 67:3, 68:20, 69:21, 71:11, 71:23, 75:8, 75:10, 76:19, 76:24, 77:22
subpoenas [14] - 17:4, 17:9, 35:18, 35:20, 36:11, 36:22, 44:23, 46:7, 46:10, 46:11,

47:25, 48:5, 49:17, 64:5
substantiate [3] - 25:17, 28:17, 52:20
substantive [1] - 41:5
substitute [1] - 58:2
suggest [3] - 49:9, 56:3, 56:9
suggested [1] - 24:12
suggesting [1] - 6:13
suggestion [2] - 23:24, 78:18
suggests [1] - 6:1
supervised [1] - 35:24
supplemental [2] - 5:18, 66:15
support [2] - 35:22, 53:24, 54:22, 61:23, 63:2
supported [2] - 60:6, 74:22
suppose [1] - 46:20
supposed [2] - 33:10, 33:11
supposedly [1] - 39:3
Supreme [11] - 36:18, 37:18, 37:20, 38:1, 38:7, 38:9, 38:13, 38:20, 49:4, 49:9, 49:15
Sygenta [2] - 57:14, 59:15
system [1] - 27:15

T

table [1] - 36:17
talks [1] - 66:17
target [1] - 50:21
targeted [2] - 59:20, 59:21, 59:22
targeting [2] - 34:9, 57:24
teleconference [1] - 1:12
ten [1] - 71:11
tend [2] - 65:21, 65:23
tension [1] - 29:13
term [2] - 10:23, 72:7
terms [4] - 18:4, 18:5, 22:9, 30:4
tests [1] - 30:6
text [1] - 36:17
THE [59] - 1:1, 1:2, 3:1, 3:16, 4:7, 4:17, 7:19, 9:23, 10:1, 10:9, 10:22, 11:16, 12:13, 12:20, 13:9, 13:11, 14:3, 16:1,

18:7, 19:9, 21:2, 21:11, 21:17, 21:22, 22:11, 23:1, 24:5, 24:22, 25:18, 26:11, 26:24, 27:9, 29:2, 32:12, 32:17, 34:5, 34:24, 35:9, 39:16, 40:22, 41:23, 44:10, 45:6, 45:24, 46:17, 48:11, 48:22, 49:22, 50:9, 62:6, 63:10, 63:16, 65:18, 67:22, 70:15, 73:20, 75:9, 77:3, 78:17
they've [2] - 64:4, 74:25
third [29] - 9:6, 14:25, 15:13, 15:15, 17:11, 19:23, 20:12, 25:25, 27:16, 27:24, 28:1, 28:2, 29:1, 30:16, 36:25, 40:21, 42:24, 43:3, 43:11, 46:23, 51:8, 55:13, 57:10, 57:22, 60:2, 62:17, 65:8, 72:15, 74:5
Third [1] - 43:8
third-party [5] - 15:13, 20:12, 29:1, 40:21, 62:17
three [14] - 5:1, 20:6, 20:24, 30:11, 36:12, 37:2, 37:10, 39:8, 39:12, 44:5, 44:6, 44:11, 58:25, 62:9
threshold [3] - 16:17, 18:11, 23:7
throughout [1] - 53:4
throw [1] - 51:20
thrown [1] - 43:19
timeline [3] - 21:22, 22:1, 22:8
timing [2] - 50:3, 62:8
today [9] - 3:15, 4:6, 5:4, 9:14, 20:5, 37:6, 55:18, 78:3
together [2] - 52:5, 52:7
top [2] - 21:14, 53:20
towards [1] - 22:25
transcript [2] - 79:12, 79:14
TRANSCRIPT [1] - 1:9
translation [1] - 66:8
transparency [1] - 52:9
treated [2] - 20:2, 39:25
treatment [1] - 68:5
trial [1] - 22:16

**trick** [1] - 67:24
**trouble** [1] - 18:13
**true** [5] - 23:22, 60:17, 67:10, 74:19, 79:15
**truly** [2] - 31:16, 62:2
**trump** [1] - 42:9
**trust** [1] - 52:8
**try** [5] - 19:14, 20:22, 33:8, 51:1, 54:23
**trying** [3] - 35:4, 51:8, 67:24
**TUNNELL** [1] - 2:3
**turn** [2] - 17:14, 35:10
**twin** [1] - 37:21
**two** [26] - 3:11, 5:18, 8:11, 9:16, 13:17, 14:3, 16:7, 21:9, 22:3, 29:21, 29:25, 30:6, 37:2, 37:9, 39:8, 39:9, 42:5, 44:11, 47:7, 58:18, 59:24, 60:10, 62:15, 67:23, 68:8, 71:3
**type** [3] - 36:7, 38:25, 69:12
**typed** [1] - 79:13
**typewritten** [1] - 79:15

**U**

**U.S** [19] - 26:5, 33:18, 35:8, 36:9, 38:4, 38:22, 43:25, 45:4, 45:14, 45:16, 52:11, 56:25, 61:9, 64:6, 64:25, 65:5, 65:11, 65:12, 75:4
**U.S.M.J** [1] - 1:12
**ultimate** [1] - 61:21
**ultimately** [2] - 44:3, 47:4
**unanimous** [1] - 38:14
**unanimously** [1] - 49:15
**unavailable** [1] - 41:19
**unbiased** [1] - 40:20
**uncommon** [1] - 23:17
**under** [22] - 16:13, 20:11, 20:24, 20:25, 27:14, 35:21, 37:7, 37:9, 40:6, 42:2, 42:3, 42:17, 42:18, 44:25, 46:11, 54:9, 60:13, 64:6, 66:2, 68:17, 72:7, 77:5
**underlies** [2] - 52:2, 69:13
**underlying** [3] - 15:24,

39:2, 41:2
**undermine** [2] - 61:4, 61:6
**understood** [10] - 14:4, 14:8, 16:1, 22:11, 24:5, 25:18, 40:7, 50:9, 70:15, 70:16
**undertaken** [1] - 47:9
**undue** [2] - 47:23, 72:20
**unfortunately** [1] - 22:20
**unhappy** [1] - 36:1
**United** [2] - 6:20, 29:18
**UNITED** [1] - 1:1
**universe** [1] - 73:18
**unlawful** [1] - 27:18
**unlawfully** [1] - 27:18
**unless** [5] - 9:21, 31:24, 58:13, 75:4, 76:16
**unlike** [2] - 23:11, 24:1
**unpublished** [1] - 43:4
**unquestionably** [2] - 7:5, 9:17
**unsecured** [2] - 13:12, 28:18
**unwise** [1] - 74:2
**up** [16] - 6:2, 7:12, 19:17, 22:4, 30:15, 34:3, 43:20, 51:20, 57:2, 60:5, 64:12, 69:22, 71:9, 74:8, 76:1, 78:3
**update** [1] - 56:14
**updated** [1] - 77:25
**useful** [2] - 36:15, 53:6
**usefulness** [1] - 23:5

**V**

**various** [1] - 21:1
**vast** [1] - 70:24
**vehicle** [1] - 26:22
**versus** [3] - 11:1, 18:11, 41:20
**via** [2] - 1:12, 16:14
**vice** [2] - 3:14, 4:5
**video** [1] - 54:13
**Video** [1] - 54:14
**view** [5] - 34:15, 44:21, 46:10, 47:13, 47:19
**violate** [1] - 52:1
**violated** [4] - 15:23, 24:13, 38:22, 59:14

**violating** [1] - 67:6
**violation** [4] - 37:13, 38:23, 42:8, 61:10
**violative** [1] - 45:4
**voluntarily** [1] - 9:6
**vote** [1] - 35:25
**vs** [2] - 1:5, 79:10

**W**

**wade** [2] - 33:11, 33:18
**waived** [1] - 12:4
**waiver** [5] - 9:3, 19:25, 31:25, 56:9, 56:17
**waned** [1] - 5:20
**warner** [1] - 79:4
**Warner** [1] - 79:22
**warrant** [1] - 15:24
**warrants** [5] - 54:2
**ways** [1] - 27:20
**week** [1] - 55:15
**weeks** [1] - 74:16
**weigh** [2] - 6:20, 47:22
**weighed** [1] - 64:4
**weighing** [1] - 33:15
**weight** [4] - 26:14, 33:14, 33:17, 75:4
**welcome** [2] - 3:17, 4:7
**Westlaw** [1] - 57:14
**Weyand** [1] - 3:25
**WEYAND** [1] - 2:4
**white** [2] - 4:13, 73:14
**WHITE** [1] - 2:12
**whole** [4] - 28:2, 32:7, 33:25, 71:13
**wide** [2] - 20:19, 55:21
**willing** [1] - 77:10
**WILLKIE** [1] - 2:6
**Willkie** [2] - 4:1, 35:13
**win** [1] - 15:3
**withheld** [4] - 6:23, 68:17, 72:6, 72:7
**withhold** [1] - 13:24
**wondering** [1] - 23:2
**word** [2] - 22:17, 63:14
**words** [5] - 7:21, 37:15, 41:1, 43:2, 49:8
**works** [2] - 23:20, 31:20
**world** [3] - 32:7, 61:15, 75:17
**worth** [1] - 78:10
**wound** [1] - 6:2
**write** [2] - 38:1, 38:15
**writing** [1] - 40:8

**wrote** [1] - 38:8

**Y**

**year** [3] - 22:25, 36:4, 38:6
**yesterday** [8] - 5:16, 6:4, 8:20, 15:18, 22:4, 23:23, 24:12, 66:15
**yourself** [1] - 21:4

**Z**

**ZF** [5] - 36:19, 37:19, 38:6, 49:3, 49:13